UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE AMERICAN BUSINESS FINANCIAL SERVICES INC. NOTEHOLDERS LITIGATION | )<br>)<br>)<br>)<br>) | Master File No. 05-232 |

**MEMORANDUM IN SUPPORT OF FINAL
<u>APPROVAL OF SETTLEMENT</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

THE LITIGATION BEGINS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

LEAD PLAINTIFFS ADVANCE THE LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

LEAD PLAINTIFFS NEGOTIATE THE SETTLEMENT . . . . . . . . . . . . . . . . . . . . . . . . . 6

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    The Settlement Is Fair, Reasonable, And Adequate
        And Should Be Approved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.    The Complexity, Length and Duration of the
             Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        B.    The Reaction of the Class to the Settlement . . . . . . . . . . . . . . . . . . . . . 10

        C.    The Stage of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        D.    The Risks of Establishing Liability and Damages . . . . . . . . . . . . . . . . 15

        E.    The Ability of Defendants To Withstand a
             Greater Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        F.    The Range of Reasonableness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    II.    The Notice to Noteholders Met the Requirements
        of Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    III.    The Plan of Allocation is Fair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    IV.    Lead Plaintiffs Should be Compensated for Their
        Out-of-Pocket Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*In re Cendant Corp. Litigation,*
  264 F.3d 201 (3d Cir. 2001) ............................................................... 15, 17

*Denoy v. Jenkins & Gilchrist,*
  230 F.R.D. 317 (S.D. N.Y. 2005) ............................................................ 21

*Girsh v. Jepson,*
  521 F.2d 153 (3d Cir. 1975) ................................................................... 9

*Gregory v. Correction Connection, Inc.,*
  1991 U.S. Dist. LEXIS 3659 (E.D. Pa. 1991) ........................................... 16

*Krangel v. Golden Rule Resources, Inc.,*
  194 F.R.D. 501 (E.D. Pa. 2000) .............................................................. 8

*Lachance v. Harrington,*
  965 F. Supp. 630 (E.D. Pa. 1997) ............................................................ 8

*Lenahan v. Sears, Roebuck and Co.,*
  266 Fed. Appx. 114, 121 (3d Cir. 2008) ................................................... 9

*Neuberger v. Shapiro,*
  110 F.Supp.2d 373 (E.D. Pa. 2000) .......................................................... 9

*In re PNC Finance Serv. Group, Inc., Sec Litigation,*
  440 F.Supp.2d 421 (W.D. Pa. 2006) ....................................................... 15

*In re Prudential Insurance Co. America Sales Practice Litigation,*
  148 F.3d 283 (3d Cir. 1998) .................................................................... 8

*In re Ravisent Techn., Inc. Sec. Litigation,*
  2005 U.S. Dist. LEXIS 6680 (E.D. Pa. Apr. 18, 2005) ........................... 9, 18

*In Re Relafen Antitrust Litigation,*
  231 F.R.D. 52 (D. Mass. 2005) .............................................................. 20

*In re Safety Components International Sec. Litigation,*
  166 F.Supp.2d 72 (D.N.J. 2001) ............................................................ 18

## OTHER CASES

*Miller v. Santilli,*
No. 1225 (Phila. Ct. Comm. Pleas July 2006) ............................................................. 5

## FEDERAL STATUTES

15 U.S.C. § 77z-1(a)(1)(A) ........................................................................................ 20

15 U.S.C.A. § 77k ........................................................................................................ 4

malta444137

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| IN RE AMERICAN BUSINESS FINANCIAL SERVICES INC. NOTEHOLDERS LITIGATION | ) ) ) ) ) | Master File No. 05-232 |

**MEMORANDUM IN SUPPORT OF FINAL
APPROVAL OF SETTLEMENT**

Lead Plaintiffs, on behalf of a Class of Noteholders[1], signed the Settlement

Agreement in this case on September 15, 2008, which is attached as Exhibit A. Promptly

thereafter, they filed with the Court a motion for preliminary approval of the Settlement,

which the Court approved on September 19, 2008. The Court:

1.      preliminarily approved the Settlement Agreement;

2.      approved as to form and content the Notice, the Proof of Claim and

Release and the Summary Notice;

3.      ordered that the Notice be mailed to all Class members for whom the

parties have or can find addresses, and that the Summary Notice be published in *USA*

*Today* and *PR Newswire*; and

4.      set November 3, 2008 at 11:00 a.m. as the date and time for the Final

Hearing.

As set forth in the Affidavit of Edward J. Sincavage, CPA, of Heffler, Radetich

& Saitta, LLP ("Heffler" and the "Heffler Affidavit"), attached hereto as Exhibit B, Lead

Plaintiffs' counsel ("Class Counsel") caused copies of the Notice to be mailed to 29,157

Noteholders on Friday September 26, 2008, and the Summary Notice to be published in

---

[1]      Capitalized terms, if not defined herein, are defined in the Settlement Agreement.

*USA Today* and on *PR Newswire* on Thursday, October 2, 2008. They caused additional Notices to be mailed as a result of address corrections and inquiries by Class members who responded to the Summary Notice. In response to the Notice, Heffler or the Parties have received as of October 13, 2008, a handful of objections or comments about the Settlement (addressed below at pages 10-15), and no requests to be excluded from the Settlement. [2]

Plaintiffs now move for final approval of the Settlement as fair, reasonable and adequate. They also move for approval of the proposed plan of allocation described in the Notice and for reimbursement of out-of-pocket expenses incurred by Lead Plaintiffs.

## THE LITIGATION BEGINS

Plaintiff Rena Johnson filed this Action as a putative class action on January 18, 2005, alleging, pursuant to Section 11 of the Securities Act of 1933, that American Business Financial Services, Inc. ("American Business" or the "Company") and the signers of three separate Registration Statements (the "Registration Statements") made material misstatements and omissions in the Registration Statements. These misrepresentations and omissions concerned the financial results and condition of American Business and specifically whether American Business would be able to pay back the Notes with interest when the Notes came to maturity. The signers of the Registration Statements, directors and officers of the Company, have now entered into the Settlement Agreement with Lead Plaintiffs.

American Business was a sub-prime mortgage company that borrowed money to fund mortgages by selling unsecured notes (the "Notes") to Class members. American

---

[2]    Objections or comments received to date are attached as Exhibit C.

Business sold Notes without any broker, at high interest rates, primarily through newspaper advertisements.

The persons who bought the Notes, often unsophisticated investors, wanted a safe investment with a high yield. In many cases, they were senior citizens and persons for whom English was not their native language. The Notes could not be resold. At maturity, the Notes were cashed in or else rolled over for another term of the same number of years. Interest was paid periodically to the Noteholder or else added to the principal amount of the Note. Some of the Notes were money market notes.

American Business sold its mortgages in bundles to financial institutions, but held back some of the interest generated by the mortgages, which American Business kept as an asset called interest only strips ("IO strips"). These IO strips were a major asset of the Company, as were the Company's so-called servicing rights (by which the Company received fees for servicing the mortgages after sale). The Registration Statements were materially misleading because they overvalued the IO strips and servicing rights, making it appear that the Company was solvent when it was not.

During 2003 and 2004, American Business conducted exchange offers, under which Noteholders could exchange their Notes for a combination of preferred stock and collateralized notes.

Three days after Plaintiff Johnson initiated this litigation, American Business filed in bankruptcy under Chapter 11. The matter was converted to Chapter 7 in May 2005. At the time of bankruptcy, American Business owed Noteholders over $500 million dollars in principal and interest on the Notes.

3

## LEAD PLAINTIFFS ADVANCE THE LITIGATION

On March 29, 2005, the Court designated John A. Malack, Virgil Magnon, Michael Rosati, S. S. Rajaram, M.D. (Hayward Pediatrics, Inc.), and Sabina Langdon as Lead Plaintiffs and Berger & Montague, P.C. as Lead Counsel.

On November 16, 2005, Lead Plaintiffs filed an Amended Complaint against defendants. American Business was not included as a defendant because of the bankruptcy stay. Henry Munster (collectively, with Malack, Magnon, Rosati, and Rajaram, the "Noteholder Plaintiffs") was added as a named representative plaintiff. (Plaintiffs and defendants are referred to collectively as the "Parties" or the "Settling Parties").

Defendants filed a Motion to Dismiss and a subsequent Motion for Judgment on the Pleadings. The Court denied in part and granted in part these motions on January 9, 2007, and July 25, 2007, respectively. Plaintiffs' principal claim under Section 11, of the Securities Act of 1933, 15 U.S.C.A. § 77k, survived both motions.

On October 3, 2007, the Court certified the Class. The Class consists of all persons who purchased or rolled over Notes between January 18, 2002 and January 21, 2005. On May 2, 2008, a Notice of Pendency of Class Action (the "Class Action Notice") was mailed to all Class members whose names and addresses were provided to Lead Counsel by George Miller, Chapter 7 Trustee of the bankruptcy estates of American Business (the "Trustee"), and to those potential Class members who had contacted Lead Counsel. Pursuant to the Class Action Notice, 73 possible members of the Class sought to exclude themselves from the Class. (The Parties have agreed to allow such persons to

4

withdraw their exclusions, should they so choose, in connection with the proposed Settlement.)

Lead Plaintiffs have undertaken wide-ranging and intensive discovery efforts. They have secured and carefully analyzed extremely large quantities of documents from the Trustee; BDO Seidman LLP ("BDO"), the Company's former auditor; the defendant officers and directors; the Pennsylvania Securities Commission (the "PSC"); and Ernst & Young, which briefly accepted American Business as an audit client in 2001 and then abruptly resigned mid-audit. Lead Plaintiffs have conducted extensive investigation, locating and interviewing key former employees. Lead Plaintiffs have also consulted at length with forensic accounting experts, dissecting the Company's financial statements and uncovering the precise manner in which the Company materially overstated income and assets, concealing its insolvency. Lead Plaintiffs were prepared to begin merits depositions in June 2008, but the proposed Settlement intervened.

Lead Plaintiffs sued BDO on February 15, 2008. Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934. Plaintiffs allege that, despite the Company's disastrous financial condition and grossly inadequate internal financial controls, BDO certified false and misleading financial statements of the Company, providing unqualified audit opinions on those financial statements, and consenting to the inclusion of those opinions in the Company's 2002 and 2003 Registration Statements.

The Trustee also filed suit against directors and officers of American Business, several of whom were also Noteholder Defendants in this Action, as well as other defendants in the Philadelphia Court of Common Pleas. *Miller v. Santilli*, No. 1225, July Term, 2006, Court of Common Pleas, Philadelphia, Pennsylvania (the "Trustee Action").

5

The Trustee Action was removed to this Court, but later remanded to the Court of Common Pleas. It is scheduled to go to trial against defendants other than officers and directors in April 2009.

## LEAD PLAINTIFFS NEGOTIATE THE SETTLEMENT

On June 10 and 11, 2008, retired Federal Judge Daniel Weinstein conducted a mediation involving the Noteholder Class, the Trustee, the former directors and officers of American Business, and the directors' and officers' insurers.

It was clear that the losses sustained by the Noteholders and the Trustee were far greater than the available insurance. Moreover, the insurance policies were a wasting asset, with approximately $5 million already paid for defense costs in the Noteholder and Trustee Actions. This left only about $35 million in insurance for the policy year at issue, 2003-2004.

After two days of intense negotiation, the Parties achieved a tentative agreement, whereby the Class and the Trustee would each be paid $16,767,500 to settle their respective cases against the officers and directors. The insurers would pay $33.5 million in total, the Estate of Anthony Santilli (the former CEO of American Business) would pay a total of $35,000, and Albert Mandia (the former CFO) would pay $10,000.[3] The proposed Settlements also obligated defendants to cooperate with the Class and the Trustee in furtherance of the Class's pending case against BDO and the Trustee's litigation against several parties. Defendants also agreed to produce personal financial information, which confirms that they lack substantial personal assets. In a separate

---

[3]    In Plaintiffs' Memorandum in Support of Preliminary Approval of the Settlement, Mandia was incorrectly listed as paying $15,000. The correct amount is $10,000.

6

undertaking, the Trustee and Lead Plaintiffs agreed to cooperate with respect to matters related to their respective ongoing litigation.

The Settlement is remarkable in that, together with the Trustee Settlement, it secures substantially all of the assets available from the defendants personally or from the insurers. The defendants, all individuals, have limited personal resources (as confirmed by the financial information they have provided to Lead Plaintiffs). In any event, the two management defendants – the estate of Santilli and Mandia – are each contributing to the Settlement out of their own pockets. In addition, the insurers are paying nearly all of the policy proceeds remaining after litigation costs with respect to the relevant policy year, 2003-2004, on each of the various levels of insurance.

Further litigation would in all likelihood reduce, not increase, the Class's recovery, even if the Class prevailed at trial. The available insurance is a wasting asset. Multiple defense counsel in this Action and the Trustee Action, engaged in vigorous, costly defense, could not help but drain the available insurance as the cases move to trial.

During the time when the Class and the Trustee were preparing the settlement papers in connection with their respective Settlements, several of the defendants in the Trustee Action filed claims for contribution or indemnification against some of the defendant directors and officers in the Trustee Action. Certain of these directors and officers threatened to upset not only the Trustee Settlement, but also the Noteholder Settlement. In response, after further extensive negotiations, the Parties agreed on a compromise whereby the insurers, the Class and the Trustee would create a "D&Os' Future Defense Fund" of $880,000, with the insurers paying $540,000 and the Class and the Trustee each contributing $170,000 (the "Holdback"). If the D&Os' Future Defense

Fund is not used up before the termination of the Trustee Action, the Trustee and the Class will get back equal shares of the remaining amount, up to $170,000 each. The Holdback contributed by the Class is part of, or payable from, the $16,767,500 Settlement Amount.

After that change was made, all insurers and defendants finally agreed to the Settlement Agreement in the Noteholder Action on Friday, September 12, 2008, and all Parties had signed by Monday September 15, 2008. The total Paid Amount (the $16,767,500 Settlement Amount less the $170,000 Holdback, for a total of $16,597,500) was deposited by October 3, 2008.

Confirmatory discovery and cooperation provided by defendants, pursuant to the Settlements, is ongoing. This includes defendants' provision of interviews, sworn statements and testimony, and other assistance as Lead Plaintiffs continue their litigation against BDO.

## DISCUSSION

I. **The Settlement Is Fair, Reasonable, And Adequate And Should Be Approved**

As a preliminary matter, the Third Circuit favors settlements of disputed claims. *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 317 (3d Cir. 1998); *Lachance v. Harrington*, 965 F. Supp. 630, 637 (E.D. Pa. 1997). This policy is particularly strong in complex class action litigation. *See, e.g.*, *Krangel v. Golden Rule Resources, Inc.*, 194 F.R.D. 501, 504 (E.D. Pa. 2000) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"). Here the Settlement will conserve judicial resources by avoiding the probable need for the Court to review and decide on

8

voluminous summary judgment, Daubert, and other pre-trial motions. The Settlement will also save judicial time by obviating the need to conduct a long, document-laden, expert-heavy jury trial, with post-trial motions, and, most likely, an appeal.

In the Third Circuit, the fairness of a settlement is determined by consideration of the nine factors articulated in *Girsh v. Jepson*, 521 F.2d 153, 156-57 (3d Cir. 1975). These factors include: "(1) the complexity, expense and likely duration of the litigation"; "(2) the reaction of the class to the settlement"; "(3) the stage of the proceedings and the amount of discovery completed"; "(4) the risks of establishing liability"; "(5) the risks of establishing damages"; "(6) the risks of maintaining the class action through the trial"; "(7) the ability of the defendants to withstand a greater judgment"; "(8) the range of reasonableness of the settlement fund in light of the best possible recovery"; and "(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." *Lenahan v. Sears, Roebuck and Co.*, 266 Fed. Appx. 114, 121 (3d Cir. 2008) (citing *Girsh*, 521 F.2d at 157). These factors establish the fairness and reasonableness of this proposed Settlement.

### A.    The Complexity, Length and Duration of the Litigation

Courts in this Circuit have long held that the complexity, expense and likely duration of the litigation in a complex securities class action weighs in favor of approving a class action settlement. *In re Ravisent Techn., Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 6680, at *24-25 (E.D. Pa. Apr. 18, 2005) (upholding settlement where "[a]bsent a settlement, this action likely would not be resolved for several additional years"); *see also Neuberger v. Shapiro*, 110 F. Supp. 2d 373, 378 (E.D. Pa. 2000) ("the prospect of complexity and additional costs encourages settlement approval").

9

Here, the litigation is more than three and a half years old. Class discovery is complete, the Class has been certified, and the Class has received the Class Action Notice. Plaintiffs have mapped out their case, following long consultation with forensic experts. In addition, witness interviews and document discovery are essentially complete. However, merits depositions, expert discovery and pretrial motions all lay ahead.

Continuing intense litigation would further erode insurance proceeds and lengthen the time the Class members would be forced to wait to get anything back on their Notes. This is especially important in this case because many Class members not only are elderly but also without substantial resources, since their "nest egg" had been invested in American Business Notes. Prompt resolution of the litigation, and prompt payment of proceeds, advances the interests of the Class, particularly in this case.

This case was complex in that it involved difficult accounting questions, varying fact patterns with respect to Class members' investments in the Notes, complicated issues arising from defendants' alleged reliance on management or experts, and other issues.

**B.    The Reaction of the Class to the Settlement**

The Notice, mailed to over 29,000 Class members, highlights Class members' right to object. Hundreds of Class members have contacted Lead Counsel and Heffler to ask questions or, in some cases, to praise the Settlement. A handful of Class members have criticized some aspect of the Settlement. The deadline for objections is October 20,

2008. As of October 13, 2008,[4] Class members (or apparent Class members) have commented or objected as follows:[5]

- One unidentified person, apparently a member of the Class, stated:

  Everyone in a class action should get a flat percentage of the settlement. The percentage shouldn't be paid because of the amount of an investment.

  Can't the lawyers settle for 20%??

To the extent the first paragraph of this purported objection can be read to criticize the plan of allocation, the purported objector is not persuasive. Recoveries should be paid on the basis of recognized loss, with Class members who lost more receiving more in the Settlement. If the "amount of an investment" were not considered, a Class member who lost $1,000,000 would receive the same amount of Settlement proceeds as one who lost $1.

The second paragraph of this purported objection ("Can't the lawyers settle for 20%??") is unclear in its meaning. The purported objector may be asserting his wish that the Settlement amounted to 20% of the Class's aggregate losses. If this is what the objector means, then, as discussed elsewhere in this Memorandum, the Settlement is the best result that could have been achieved under the circumstances. Substantially all available assets -- both from insurance proceeds and the management defendants' personal holdings -- have been paid in the Settlement and the Trustee Settlement. Certainly, the Settlement is within the range of reasonableness.

---

[4]     Lead Counsel will address further objections received, if any, in a subsequent submission to the Court.

[5]     All of the communications referenced here are attached at Exhibit C to this Memorandum.

To the extent that the purported objector seeks to complain that attorney's fees should be limited to 20% of the Settlement Fund, the attorney's fees requested here are reasonable and in accord with the precedents of this Court. See Plaintiffs' Memorandum in support of the petition for attorney's fees and expenses.[6]

- Peter Mathus, in an October 6, 2008 communication, stated:

> I guess my objection is with the plan of allocation. Are all claims to be treated equally or will there be circumstances that will dictate the outcome of claims[?]

Mr. Mathus stated that his Notes matured, and should have been paid off, soon before the January 2005 bankruptcy filing. These Notes were not paid off.

Thelma M. Boucher, in an October 7, 2008 letter, also objected on this ground:

> I object to the proposed plan of allocation because it appears to make no distinction between those class members who submitted timely written requests for redemption of their investment and those who did not.

Lead Plaintiffs believe this objection by Mr. Mathus and Ms. Boucher is not well taken. The plan of allocation distributes Settlement proceeds based on the amount of principal and interest owed as of the date of the bankruptcy filing. For these purposes, it should not matter whether principal amounts owed included Notes that, according to their terms, matured prior to the bankruptcy filing date. Regardless of Note maturity date, the misrepresentations and omissions on which this Action is based relate back to the 2001, 2002 and 2003 Registration Statements.

---

[6]    This purported objection fails in numerous respects to satisfy the requirements for objections set forth in the Notice. (Among other things, the purported objection fails to provide name, address, telephone number, signature, and purchase date(s) and amount(s) of Notes purchased. Nor was it filed with the Court.) Nonetheless, Lead Counsel intend to bring to the Court's attention all purported objections, even if they fail to satisfy these requirements.

To the extent that Mr. Mathus and Ms. Boucher complain about the failure of American Business to reclaim or pay off Notes upon maturity, that is a contract claim, not a securities claim. It is a claim against American Business, now in bankruptcy, not against the officer and director defendants, who were sued in this litigation as the signatories of the Registration Statements. The claim with respect to failing to redeem Notes on maturity should be addressed to the Bankruptcy Court.[7]

- Gary Ford, in an October 9, 2008 note, states:

> This settlement does not make the Noteholder whole and does not address the Chapter 7 filing and who benefits from this action.

The Settlement and the Trustee Settlement have secured substantially all of the assets available, directly or through insurance, from the officer and director defendants. There would be fewer proceeds, not more, available for distribution if the Action were to proceed through trial and appeals. In addition, to the extent that Mr. Ford asserts that the Settlement "does not address the Chapter 7 filing", in fact the Notice describes both the bankruptcy proceedings and the Trustee Settlement on pages 1, 2 and 4 of the Notice.

- Robert C. Carver complains that he has not been permitted "any input in the decision making process" with respect to the Settlement. That is not accurate. Mr. Carver's objection will be considered by the Court. He further states: "A

---

[7]    In addition, Mr. Mathus complains that the Form 1099 he received for 2004 was inaccurate, causing him loss. This complaint is outside the realm of this Action, which concerns securities law violations in connection with Registration Statements. For her part, Ms. Boucher states that she objects to the Settlement because she was misled by an August 30, 2004 press release issued by American Business. This statement does not constitute an objection to the Settlement. Lead Plaintiffs agree that American Business and its officers and directors misled the investing public. Indeed, defendants' material misrepresentations and omissions are precisely what Lead Plaintiffs have litigated about in the Action.

13

significant portion of the class would seriously consider risking the tiny

settlement we are being offered, to press criminal charges and send the

perpetrators to prison." This also is not accurate. The Settlement is not

"tiny", but instead pays out, together with the Trustee Settlement,

substantially all available assets with respect to the officers and directors.

Further litigation would likely reduce, not increase, the Class's recovery. In

any event, this litigation is, of course, civil and not criminal in nature, and it is

beyond the power of the Court in the present litigation to "send the

perpetrators to prison".

- Finally, M. Joan Bryan complained about the exchange offers, stating, in part:

"This move should have landed them all in jail for a long time." Ms. Bryan

does not appear to object to the Settlement. (It should be noted that the

present litigation alleges liability with respect to the Class's purchase of the

Notes, and not their participation in the exchange offers.)[8]

Summing up, the most common complaint of the objectors and other Class

members concerned not the Settlement but instead the financial devastation they have

suffered as a result of their purchase of the Notes.[9] This complaint only points to the

necessity of recovering all amounts possible, from all possible sources, to begin the

process of compensating Note purchasers. This Settlement and the Trustee Settlement

---

[8]     Several Class members expressed approval of the Settlement. For example, Fred
R. Hunter, Sr. wrote: "We are in agreement with the settlement. A job well done!" (Mr.
Hunter's letter, in addition to the various Class member objections and comments
addressed above, are attached at Exhibit C to this Memorandum.)
[9]     As Mrs. Dorothy Kleinworth wrote: "I believe this is fraud, maybe even someone
should go to jail." To the extent Mrs. Kleinworth objects, her objection goes to the
amount of attorney's fees requested. Her objection is addressed in the Memorandum in
support of the petition for attorney's fees and expenses.

release only officer and director defendants. Other litigations continue, including Lead

Plaintiffs' case against BDO and the Trustee's action against several parties, including

Wall Street banks.

### C.    The Stage of Proceedings

This factor permits a court to determine whether plaintiffs have had access to

sufficient material to evaluate their case and, on an informed basis, to assess the adequacy

of the proposed Settlement in light of the case's strengths and weaknesses. *See In re*

*Cendant Corp. Litig.*, 264 F. 3d 201, 235 (3d Cir. 2001) ("[This factor] captures the

degree of case development that class counsel have accomplished prior to settlement.

Through this lens, courts can determine whether counsel had an adequate appreciation of

the merits of the case before negotiating.").

Here, the stage of proceedings is a factor in favor of Settlement. The case is more

than three and a half years old. It has survived a motion to dismiss, and a motion for

judgment on the pleadings. Following considerable class discovery, the Class has been

certified. By the time the Settlement was reached, Class Counsel had analyzed tens of

thousands of documents; consulted extensively with forensic experts; interviewed

numerous former employees, officers, and directors; dissected American Business public

filings and uncovered their false statements and omissions; and prepared for merits

depositions. At this stage, Class Counsel have made sufficient investigation to know the

worth of the case and the risks.

### D.    The Risks of Establishing Liability and Damages

In securities class actions, the determination of liability is a complicated and

uncertain process, typically involving conflicting expert opinions. *In re PNC Finance*

15

*Serv. Group, Inc., Sec Litig.*, 440 F. Supp. 2d 421, 434-35 (W.D. Pa. 2006). The reaction of a jury to complex expert testimony is highly unpredictable. *Id.* Thus, a jury trial is a risky enterprise, especially in a case like this where expert accountants would go head-to-head concerning complex and difficult accounting issues.

In this case liability and the affirmative defense of loss causation presented serious challenges. The outside director defendants would likely have claimed they relied on the assurances of management and BDO, and the management defendants would have alleged reliance on BDO and perhaps also Wall Street investment firms. These firms engaged in securitizing the Company's loans. *See, e.g., Gregory v. Correction Connection, Inc.*, 1991 U.S. Dist. LEXIS 3659 at *54-55 (E.D. Pa. 1991).

Lead Plaintiffs would have asserted the existence of "red flags" that a reasonably diligent Board member should have recognized, and proceeded to correct, false statements in the Registration Statements. However, defendants would have emphasized the extremely technical nature of the key components of American Business's financial statements – such as gain on sale accounting and the valuation of IO strips and servicing rights. They would have asserted that these complicated matters involve the exercise of judgment, and that reasonable persons could disagree. And, again, they would have said they relied on experts.

As for loss causation, defendants would have argued they satisfied their burden because members of the Class suffered loss as a result of matters having nothing to do with alleged misrepresentation and omissions in the Registration Statements. Instead, they would have argued that other factors brought the Company down – such as the low

interest rate environment a few years ago, or even the long brewing subprime crisis that is currently shaking the country's financial underpinnings.

Further, at trial defendants would have argued that almost all of the Lead Plaintiffs knew they were taking a risk when they bought their Notes. Each of the three Registration Statements sets forth extensive risk disclosure. A jury might not have been sympathetic to persons that, the jury might have concluded, had knowingly taken risks when they purchased the Notes.

**E.     The Ability of Defendants To Withstand a Greater Judgment**

This *Girsh* factor addresses whether Defendants "could withstand a judgment for an amount significantly greater than the [proposed] Settlement." *Cendant*, 264 F. 3d at 240.

The Settlement, together with the Trustee's Settlement, used up virtually all the available directors and officers insurance. Santilli's estate and Mandia, claiming that they had few assets, paid $25,000 and $10,000, respectively, from their own pockets. Class Counsel have confirmed through interviews and the financial disclosure required by the Settlement that, in general, the defendants lacked reachable assets that, if secured, would have materially supplemented the Settlement Amount. Thus, it is very unlikely that further proceedings would have resulted in a larger recovery for the benefit of the Class. This is especially true since the insurance proceeds were a wasting asset, and defense costs were growing rapidly. In a word, what the Class settled for, given the circumstances, was the most the Class could have gotten, no matter how skillfully Lead Plaintiffs had continued to conduct the litigation.

17

F.     **The Range of Reasonableness**

These two *Girsh* factors look at "how the settlement compares to the best and worst case scenarios" by "evaluating whether the settlement represents a good value for a weak case or a poor value for a strong case." *See Ravisent*, 2005 U.S. Dist. LEXIS 6680, at *32; *see also In re Safety Components Int'l. Sec. Litig.*, 166 F. Supp. 2d 72, 92 (D.N.J. 2001) ("in conducting this evaluation, it is recognized 'that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding too large a settlement based on the court's view of the merits of the litigation'").

Although a verdict in this case might possibly have been many times the Settlement Amount, even if it held up after appeal, it would have been uncollectible. After a monumental battle, the insurance money would have been greatly diminished, and Mandia, the Estate of Santilli and the non-management defendants would not have increased their reachable assets. Two or more years would have passed. This Settlement gives the Class the maximum amount available at the earliest possible time.

Thus, all of the relevant *Girsh* factors lead to the conclusion that this Settlement is fair, reasonable and adequate and should be approved.

II.     **The Notice to Noteholders Met  the Requirements of Due Process**

As provided in the Settlement Agreement and ordered by the Court, on September 26, 2008, Heffler sent out 29,157 copies of the Notice to the persons on the mailing list. See Heffler Affidavit, paragraph 6, attached to this Memorandum at Exhibit B.  The list used was updated from the mailing list Heffler had used, on behalf of Lead Plaintiffs, for mailing the Class Action Notice on May 2, 2008.  Because of the May 2, 2008 mailing,

18

Heffler had previously researched any addresses for persons whose Notices had been
returned by the Postal Service and corrected addresses as appropriate. Also included in
the mailing list were all persons who had contacted Lead Counsel since suit was filed in
January 2005. Heffler Affidavit, paragraphs 3-5.

In addition to the mailing, at the direction of Lead Counsel, Heffler published the
Summary Notice on Thursday, October 2, 2008 in *USA Today* and on *PR Newswire*.
Heffler Affidavit, paragraph 9. Finally, the Trustee had posted on his website,
abfsonline.com, information concerning the Settlement in the present litigation. This
webpage is attached as Exhibit E. A substantial number of persons contacted Lead
Counsel in response. See Declaration of Elizabeth W. Fox, attached as Exhibit D.

Accordingly, Class Counsel believe the Notice program in this case was the best
practicable notice, fully in accord with due process.

III.    **The Plan of Allocation is Fair**

The Plan of Allocation is fully described on page 8, Question 25, of the Notice. It
provides that each Class Member who sends in an acceptable Proof of Claim
("Authorized Claimant") will get his, her or its *pro rata* share of the Net Settlement
Amount. The Recognized Loss for each Authorized Claimant will be based on the total
amount American Business owed the Authorized Claimant at the time of the bankruptcy,
for Notes bought or rolled over after January 18, 2002.

No consideration (or recognized loss) will be given for the preferred stock owned
by the holders of collateralized Notes, and the collateralized Notes will not be treated
differently from (or accorded any greater or lesser amount of recognized loss than) the

19

unsecured Notes.  (As noted, Noteholders were given the option of obtaining preferred

stock and collateralized Notes through exchange offers in 2003 and 2004.)

Some Class members received payments on their Notes from American Business

shortly before American Business's bankruptcy.  Some of these persons were required to

pay to the Trustee some of the amount received, since these payments might be

considered preference payments.  In such cases, the amounts such Class members paid

back to the Trustee will be added to their Recognized Loss.

The Plan of Allocation does not pay any payable claims for less than $10.00.

This will eliminate considerable expense to the Settlement Fund without a large sacrifice

on the part of the Claimants.  *See In Re Relafen Antitrust Litig.*, 231 F.R.D. 52, 64 (D.

Mass. 2005) (stating, "[t]his court chooses $10 as a minimum recognized claim amount

required for a consumer to receive a check....").

Altogether, the Plan of Allocation is fair to all Noteholders.  Those who lost more

will receive more, in exact proportion to the amount lost.  Other than the out-of-pocket

amounts discussed below, Lead Plaintiffs will receive their proportionate share just like

all other Class Members.

## IV.    Lead Plaintiffs Should be Compensated for Their Out-of-Pocket Expenses

In securities cases, the PSLRA limits the class representatives' recovery to their

pro rata share of the settlement.  15 U.S.C. § 77z-1(a)(2)(A)(vi).  However, Lead

Plaintiffs may be reimbursed for reasonable costs and expenses associated with service as

lead plaintiff, including lost wages.  The criteria that courts use to award such costs

include the amount of time spent by the lead plaintiff, the duration of the litigation, the

20

benefit to the plaintiff of the settlement, and the amount of the settlement. *Denoy v. Jenkins & Gilchrist*, 230 F.R.D. 317, 355 (S.D.N.Y. 2005).

Lead Plaintiffs have been exceptionally active in this litigation. At least twelve conference calls were held with Lead Plaintiffs and Class Counsel. Class Counsel mailed most filings to Lead Plaintiffs and received numerous phone calls from Lead Plaintiffs asking about those papers and the progress of the litigation. Some of the Lead Plaintiffs have called each other to discuss the litigation.

Each of the Lead Plaintiffs produced documents to Defendants' counsel. Each was prepared for deposition, and each sat for deposition -- in one case, for eight hours. Frequently, Lead Plaintiffs called Class Counsel about new information or to offer suggestions or direction. Michael Rosati, who is now 82, travelled to meetings in Wilmington, Delaware with respect to the bankruptcy proceedings and attended the Settlement mediation.

Each of the Lead Plaintiffs has submitted a sworn declaration listing the number of hours he devoted to the litigation and the reasonable hourly rate at which he would be compensated in business. *See* Exhibit G. Class Counsel respectfully submit that the Court should award John Malack $4,794.00, Michael Rosati $6,600.00, Virgil Magnon $10,440.00, Henry Munster $208.00, and S.S. Rajaram and Hayward Pediatrics, Inc. $16,000, for a total of $32,042.00. The Notice stated that not more than $50,000 would be requested for Lead Plaintiffs.

## **CONCLUSION**

For the reasons explained above, the Settlement is fair, reasonable and adequate and should be finally approved, in accordance with the (proposed) Final Approval Order attached hereto, and the awards to Lead Plaintiffs should be approved.

Respectfully,


/s/ TODD S. COLLINS
Todd S. Collins (TSC4390, I.D. No. 29405)
Elizabeth W. Fox (EWF6692, I.D. No. 33456)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile:  (215) 875-5715
tcollins@bm.net
efox@bm.net


*Plaintiffs' Lead Counsel*

malta442014

22