IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| IN RE AMERICAN BUSINESS FINANCIAL SERVICES INC. NOTEHOLDERS LITIGATION | : : : | Master File No. 05-232 |
| This Document Relates To All Actions | : : | |

O'NEILL, J.                                             NOVEMBER 21, 2008

### MEMORANDUM

This consolidated class action brought against defendants Anthony J. Santilli, Leonard Becker, Michael DeLuca, Harold Sussman, Albert W. Mandia, Jerome Miller, Warren E. Palitz and Jeffrey S. Steinberg has been filed on behalf of all persons who suffered damages as a result of their purchase of Notes from American Business Financial Services, Inc. ("ABFS") during the class period.[1]  Plaintiffs allege that registration statements that became effective in 2001, 2002 and 2003 were illegally issued without the use of broker/dealers, contained untrue statements of material fact and omitted material facts.  Plaintiffs sought damages for violations of Sections 5, 11, 12(a)(1), 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act") and Sections 20 and 29(b) of the Securities Exchange Act of 1934 ("1934 Act").  Plaintiffs have reached a settlement of their claims against defendants in the amount of $16,767,500.  Before this Court are plaintiffs' motion for final approval of settlement including the proposed plan of allocation and reimbursement of out-of-pocket expenses[2] incurred by lead plaintiffs and plaintiffs' motion for award of attorneys' fees and costs.

---

[1] ABFS is not a defendant in this case because it filed for protection under Chapter 11 of the Bankruptcy Code on January 21, 2005.

[2] While lead plaintiffs' state that their request is for expenses, it seeks mainly compensation for time at an hourly rate plus minimal costs.

BACKGROUND

A.    General Background

ABFS was a diversified financial services organization that sold and serviced business

purpose home equity loans through its subsidiaries.  ABFS also purchased home equity loans

from financial institutions.  Plaintiffs allege that the typical customers of ABFS and its

subsidiaries were credit-impaired or high-risk borrowers who could not obtain traditional

financing from banks or savings and loan associations.  During the class period, defendant

Santilli served as ABFS's chairman, chief executive officer, chief operating officer, and director,

defendant Mandia was ABFS's chief financial officer, and defendants Becker, DeLuca, Sussman,

Miller, Palitz, and Steinberg were all directors of ABFS.

Plaintiffs allege that to raise capital ABFS used a financing technique known as

securitization.  In its Form 10-K filed with the Securities and Exchange Commission ("SEC") on

October 10, 2000, ABFS noted that "[t]he ongoing securitization of our loans is a central part of

our current business strategy."  In each of its securitizations, ABFS transferred a pool of

mortgage loans to a trust in exchange for certificates, notes or other securities issued by the trust

that were then sold to investors for cash.  Plaintiffs allege that ABFS would often retain the rights

to service the loans for a fee and would retain an interest in the cash flows generated by the

securitized loans, called an "interest-only strip" ("IO strip").

ABFS was able to securitize most of its mortgages from January 2002 through March

2003.  In June 2003, however, ABFS was forced to change its business plan because investment

banks refused to securitize pools of ABFS mortgages.  ABFS began selling the mortgages it

originated on a whole loan basis for cash, which was much less profitable than securitization.  In

2003 and 2004, ABFS conducted exchange offers which allowed noteholders to exchange their notes for a combination of preferred stock and collateralized notes.

ABFS borrowed directly from financial institutions to fund its mortgages. These financial institutions required ABFS to maintain a specific financial condition. If ABFS's financial condition fell below the specified level, all outstanding loans from the banks would become due.

According to plaintiffs, ABFS pressured its mortgage originators to create as many loans as possible. Under this policy, ABFS mortgage originators frequently sold mortgages to people who could not afford the mortgage payments. One former employee noted that approximately ten percent of loan customers defaulted on their first payment.

ABFS also funded its operation through the sale of notes. ABFS sold these notes through newspaper advertisements, direct mail and sales calls without the involvement of underwriters or brokers. Plaintiffs assert that ABFS generally did not include a copy of a prospectus in its solicitations. The notes offered interest rates well above the prime rate. They were for varying terms with maturity rates from a few months to as much as ten years. A buyer could choose either to receive interest during the term of each note or to have the interest reinvested in new notes. The notes were not transferrable and noteholders could only cash in the notes upon their maturity. ABFS rolled over a note if the noteholder did not request his money back within a few days of the note's maturity date.

For most of the class period, when a note was coming due, ABFS called or sent notice to the notcholder. In October or November 2004, ABFS stopped sending these notices. ABFS also began rolling over notes instead of paying noteholders even if a noteholder requested payment.

3

B.    <u>Litigation Background</u>

Plaintiffs filed complaints on January 18, 2005 and January 25, 2005 which were consolidated in this action. On January 21, 2005, ABFS filed a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code, Title 11 of the United States Code, in the United States Bankruptcy Court for the District of Delaware in Wilmington, Delaware. <u>In re ABFS, Inc., et al.,</u> (No. 05-10203) (MFW). Pursuant to Section 362 of the Bankruptcy Code, ABFS' bankruptcy filing automatically stayed this action. On May 17, 2005, the company's Chapter 11 bankruptcy proceeding was converted to a Chapter 7 liquidation.

I designated John A. Malack, Virgil Magnon, Micheal Rosati, S.S. Rajaram, M.D. (Hayward Pediatrics, Inc.) and Sabina Langdon as lead plaintiffs and Berger & Montague, P.C. as Lead Counsel. The lead plaintiffs filed an amended complaint on November 16, 2005.

Defendants filed a motion to dismiss and a motion for judgment on the pleadings which I denied in part and granted in part on January 9, 2007 and July 25, 2007, respectively. I granted plaintiffs' unopposed amended motion for class certification on October 3, 2007 which created a class of all persons who purchased or rolled over notes between January 18, 2002 and January 21, 2005.

Litigation is also occurring in related cases. Lead plaintiffs sued BDO Seidman LLP, ABFS's outside auditor during the class period, on February 15, 2008 in this Court and the trustee has filed suit against directors and officers of ABFS and other defendants in the Philadelphia Court of Common Pleas.

The parties attended mediation on June 10 and 11, 2008 involving the class, the trustee, the former directors and officers of ABFS and the directors' and officers' insurers. Lead

plaintiffs, on behalf of the class, signed the settlement agreement on September 15, 2008. I granted a motion for preliminary approval of the settlement on September 19, 2008. A final hearing was held on November 3, 2008.

C.    Settlement Terms

The settlement agreement outlines the details of the settlement. The parties reached a settlement agreement whereby the class and the trustee would each be paid $16,767,500 to settle their cases against the officers and directors. This amount was derived from the insurer paying $33.5 million, the Estate of Anthony Santilli paying $25,000 and Albert Mandia paying $10,000.

The settlement agreement's plan of allocation provides that each class member who sends in an acceptable "Proof of Claim" ("authorized claimant") will get his, her or its pro rata share of the net settlement amount. This share provides approximately 2.5% of the value of the original notes. The recognized loss for each authorized claimant will be based on the total amount ABFS owed the authorized claimant at the time of the bankruptcy for notes bought or rolled over after January 18, 2002. The plan does not provide consideration or recognize loss for preferred stock owned by the holders of collateralized notes because all notes are treated the same. The plan acknowledges that those class members who received payment shortly before ABFS's bankruptcy and had to remit that payment to the trustee will have that amount added to their recognized loss. The plan does not pay any claims for less than $10.00. The plan of allocation has all noteholders receiving their proportionate share. The agreement also obligated defendants to cooperate with the class and the Trustee in furtherance of their pending cases. Upon consideration of the pending cases, the class and trustee created a "D&Os' Future Defense Fund" of $880,000 with the insurers paying $540,000 and the class and trustee contributing $170,000

each. If this holdback is not used up before the termination of the trustee action, the trustee and class will get back equal shares of the remaining amount up to $170,000 each.

The settlement agreement requests that the Court award the following lead plaintiffs' "expenses": John Malack $4,794.00, Michael Rosati $6,600.00, Virgil Magnon $10,170.00, Henry Munster $304.00, and S.S. Rajaram and Hayward Pediatrics, Inc. $16,000.00. This total is $37,868.00.

The settlement amount was deposited in an interest-bearing account by October 3, 2008.

D.    Fairness Hearing

On November 3, 2008, I held a hearing to determine the fairness of the proposed settlement and the motion for award of attorneys' fees and costs. Approximately thirty class members attended the hearing.[3] Prior to the hearing, lead counsel addressed the class members to explain the settlement and answer their questions. Of the class members in attendance, seven wanted to raise their objections or questions with the Court. Lead counsel and I addressed each objection or question.

First, Patty Brandt spoke about how she lost all of her husband's IRA money which was meant to be used to send her children to college. I explained to the hearing attendees that there needed to be additional money available from the defendants to support not approving the settlement and it has not been shown that such funds are available. Lead counsel also explained

---

[3] The following individuals attended the hearing: Mary Nociforo, Jose Pawang, Ed and Rose Spector, Samuel C. Dove Sr and Esther Dove, Sergio Gallina, John J. Trolio, Huyen Ngoe Vu, Phoung Vu, Nickolai Brandt, Patty Brandt, Dick Nugent, William C. Robinson, Olivia D. Robinson, Verena Lokey, Carol J. Sondej, Ella Green, O'Donald Green, Chas Ruppert, Beverly T. Volk, Michael Rosati, Elaine Brown, Herbert Brown, Helen Cortez, Robert Hopely, Holly Barette and Alfred Teah.

the allocation plan and how lead plaintiffs and the trustee are still pursuing claims against other defendants that may provide additional relief for the class.

John Trolio admitted that he did not think he would ever see any recovery and that the questions he came to the hearing with had all been answered. Mr. Trolio had previously filed written objections that raised issue with the fact that senior collateralized and preferred stock noteholders, like himself, were told by ABFS they were assured recovery. He had also raised questions in his written objections with how to calculate his distribution, when he would receive his claim, what he was agreeing to and how to complete the forms. He stated these questions were no longer at issue.

Mary Nociforo stated how upset she was that she lost all of the money she worked hard to save and invested, especially when ABFS assured her that everything was okay. She stated that she hoped the court would be able to do more for the class.

Sergio Gallina objected to the senior collateralized noteholders not receiving more in the settlement than other noteholders. Lead counsel explained that the plan of allocation was the fairest and most straight forward approach because the collateralized noteholders would likely have priority in bankruptcy and using other plans would increase administrative fees which would further deplete the available settlement funds.

Helen Cortez requested that I consider that her relief should differ from other noteholders because she gave her IRA to ABFS under custodial care. Lead counsel explained that its proposal does not give preferential treatment to any noteholders because, if it did, there would be many claims for such treatment. In addition to claims by those who invested their IRAs, there have been claims for preferential treatment by noteholders who complained before ABFS filed

7

bankruptcy and those who had their notes rolled over against their will. Lead counsel stated that the rationale behind the plan of allocation is that the entire class was hurt by the same behavior and thus there should be no distinctions. Ms. Cortez also questioned how the 2.5% was determined as this seemed too little for the great loss that was suffered by the noteholders. Lead counsel had previously explained this.

Elaine Brown then spoke about the fraud perpetrated by the defendants. She brought a portion of the mail sent to her to get her to turn her notes into preferred stock. She also took issue with her preferred stock not taking priority in the settlement when she was told it was more valuable and that she would be paid first. It was explained that the priority would be an issue in the bankruptcy proceeding.

Finally, Chas Ruppert asked where the money from collection of ABFS's outstanding loans is going. Lead counsel explained that the proceeds of the loans owed to ABFS would be paid to the bankruptcy estate and the trustee would distribute these proceeds according to bankruptcy law. It was explained that this was a possible way that additional money would be available for the noteholders but that there was no way to get this money for the class in this action because the loans are to be paid to the bankruptcy estate.

After the attendees who wished to speak had their opportunity, defense counsel Marc Sonnenfeld explained that the defendants' individual net worth was also tied up in ABFS, and therefore they did not have any additional money to contribute. He stated that the defense costs come out of the insurance policy so litigating this matter further would only decrease the amount of funds available for the class. The insurance policy has already been depleted significantly by defense costs because the defendants were simultaneously litigating other claims which fall under

8

the same policy. Additionally, the insurance had eight levels which complicated the process. Mr. Sonnenfeld complimented plaintiffs' counsel on their performance in the action which made it possible to achieve settlement.

DISCUSSION

I.    Proposed Settlement

Rule 23 class action settlements must be approved by the court. See Fed.R.Civ.P. 23(e). The Court of Appeals favor settlements of disputed claims especially in complex class action litigation. See In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 317 (3d Cir. 1998); Krangel v. Golden Rule Resources, Inc., 194 F.R.D. 501, 504 (E.D. Pa. 2000). In Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975), the Court of Appeals set forth nine factors that should be considered in connection with a class action settlement's fairness, reasonableness, and adequacy. In re Cendant Corp. Litigation, 264 F.3d 286, 300 (3d Cir. 2001). The nine Girsh factors are: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial;[4] (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. In re Cendant Corp. Litigation,

---

[4] The Court of Appeals stated that consideration of this factor appears perfunctory in 'settlement-only' class actions following the Supreme Court's decision in Amchem because "the district court always possesses the authority to decertify or modify a class that proves unmanageable." In re Prudential, 148 F.3d at 321.

9

264 F.3d at 300. "These factors are a guide and the absence of one or more does not automatically render the settlement unfair. Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under Girsh." O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266, 293 -304 (E.D. Pa. 2003), quoting In re Orthopedic Bone Screw Prods. Liah. Litig., 176 F.R.D. 158, 184 (E.D. Pa. 1997). Additional factors relevant to this case are whether the settlement was the product of an arm's length negotiation between experienced counsel, whether the allocation plan is fair, adequate and reasonable, Smith v. Dominion Bridge Corp., 2007 WL 1101272, at *3 (E.D. Pa. 2007), and whether the notice provided to class members was adequate. In re Aetna Inc. Sec. Litig., 2001 WL 20928, at *4 (E.D. Pa. Jan. 4, 2001), citing In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 784 (3d Cir. 1995).

A.    The Complexity, Expense and Likely Duration of the Litigation

This factor is intended to capture "the probable costs, in both time and money, of continued litigation." In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig., 55 F.3d 768, 812 (3d Cir. 1995). Consideration of the costs of continuing on the adversarial path allows me to gauge the benefit of settling the claim amicably. Id.

This case is in the early stages of litigation despite its filing more than three and a half years ago. While class discovery, certification and notice requirements, witness interviews and document discovery have been completed, more litigation remains before this case would be resolved. If litigation were to continue it is likely there would be merits depositions, expert discovery, motions for summary judgment, Daubert motions and other pre-trial motions. In

addition, there would likely be a long jury trial due to the complex issues involved and the presentation of the varying fact patterns of the class members' investments, post-trial motions and an appeal.

Settlement avoids the substantial delay in recovery and expense that would accompany further pursuit of this litigation. Avoiding both of these outcomes is particularly important in this litigation when delay in recovery would greatly harm many of the class members who are elderly and without substantial resources due to loss of their investments. The additional expenses will only erode the available insurance proceeds which are a wasting asset as $5 million has already been consumed for defense costs in this action and the trustee action. Thus, this factor weighs in favor of approving the settlement.

B.    The Reaction of the Class to the Settlement

The classes' reaction "is perhaps the most significant factor to be weighed in considering [the Settlement's] adequacy." Sala v. National R.R. Passenger Corp., 721 F. Supp. 80, 83 (E.D. Pa.1989). This factor looks at the "number and vociferousness of the objectors" to help gauge whether the class members support the settlement. In re GM Truck, 55 F.3d at 812.

Notice was sent to over 29,000 class members explaining their right to opt-out of or object to the settlement. As of October 23, 2008, 5,372 proof of claim forms were received. Lead counsel advises that many class members contacted them to ask questions or praise the settlement, including Fred R. Hunter. As of October 27, 2008, 80 class members opted out of the settlement. Lead counsel states that two of these individuals have stated they would like to rescind their opt-out request.

There were 32 written objections to the proposed settlement and 7 verbal comments and/or objections at the November 3rd hearing. Most of the objectors, like Gary Ford, Abraham V. Abraham,[5] Mary Jane Fodor, Gobind and Meera Kanal, Brook, Robert Favela, Jon Gaboriault, Keen-Mills, Malkait Mannan, Margaret Schwartz, Mireille Tinawy, John Troilio, Nicky Yu, Patty Brandt and Mary Nociforo, raised concern over the amount the noteholders lost, the amount they will receive in the settlement, how much the wrongdoers should have to pay and the seriousness of the wrongdoing. These objections do not provide any suggestion as to how to enhance the value of the settlement. It has been explained to the objectors why the available funds are so low and the potential for additional relief in other pending litigation. It was also explained to the objectors that failure to settle this litigation will lead to less availability of money for the class, not more.

Furthermore, the settlement is not intended to compensate each and every aggrieved individual fully for his loss, but instead represents a reasonable amount of relief for the settlement class, given the risks inherent in further litigation. The notice expressly states that the class will receive at least 2.5% of their recognized claims. I recognize that this settlement is not nearly enough to compensate the losses of the class members, and I acknowledge their frustration and despair over the loss of their savings. The objectors should feel confident that if a larger settlement seemed possible or a larger recovery with the ability to collect existed if the case proceeded to trial, I would not approve this settlement. In this case, proceeding to trial would merely reduce the available funds for the class. However, each individual receiving the notice

---

[5] Lead counsel states that Mr. Abraham withdrew his objection.

has the right to exclude himself from the settlement and retain any right he may have to sue defendants on his own.

Additionally, a few objectors, like Robert C. Carver, Joan Bryan, Dorothy Kleinworth, Gohind and Meera Kanal, Nicky Yu, and Elaine Brown, requested criminal prosecution of the defendants for the harm they caused the noteholders. This is not a matter for me to decide.

The deadline for exclusion or objections was October 20, 2008, and the responses received weigh in favor of settlement.

C.    Stage of the Proceedings and the Amount of Discovery Completed

This "captures the degree of case development that class counsel have accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." In re Cendant, 264 F.3d at 235.

Lead plaintiffs conducted extensive discovery prior to settlement negotiations. They secured and analyzed large quantities of documents from the trustee, BDO Siedman LLP which served as ABFS's former auditor and Ernst & Young which briefly accepted ABFS as an audit client in 2001 and abruptly resigned. These documents and documents from public filings were reviewed. Lead plaintiffs conducted investigations of key former employees and officers and directors. They consulted with forensic accounting experts to evaluate ABFS's financial statements. Lead plaintiffs prepared for and attended depositions with regards to class certification. No merit depositions occurred but the relevant documents have already been analyzed. The case was pending for over three years before negotiations began in June 2008. The parties had ample time to familiarize themselves with the facts of the case and determine

13

their positions with regard to the risks and rewards trial may bring.[6]

A substantial amount of work remains in this litigation for both parties including merits depositions, expert witnesses, motions for summary judgment, other pre-trial motions, trial and appeals. However, the question of defendants' liability was thoroughly investigated in advance of the negotiations. Beyond expert witnesses, it is unclear how further discovery would have added anything to the consideration of defendant' liability. Lead plaintiffs were able to form an "adequate appreciation of the merits of the case" before negotiating." In re GM Trucks, 55 F.3d at 813. Thus, this factor weighs strongly in favor of approving the Settlement.

D.      Risks of Establishing Liability and Damages

"A court considers this factor in order to 'examine what the potential rewards (or downside) of litigation might have been had the class counsel decided to litigate the claims rather than settle them.'" In re Cendant, 264 F.3d at 237, quoting In re GM Truck, 55 F.3d at 814. On this issue, conducting a mini-trial analyzing actual liability should be avoided and credence must be given "to a certain extent . . . to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may he raised to their causes of action." In re IKON, 209 F.R.D. 94, 105-06 (E.D. Pa. 2002), quoting Lacbance v. Harrington, 965 F .Supp. 630, 638 (E.D. Pa. 1997).

Lead counsel discussed the risks for the class of continuing to trial. While lead counsel state review of the numerous documents at issue uncovered false statements and omissions, they

---

[6] This factor overlaps with Rule 23(a)(4)'s requirement that the plaintiff adequately represents the class. Both inquiries are directed to the question of the ability of the class counsel. I am satisfied that class counsel has adequately represented the class throughout the proceedings and the settlement negotiations.

14

acknowledge the risk of presenting the complex accounting issues involved to a jury. They also acknowledge that conflicting expert opinions likely will be presented which creates a significant risk in a jury trial. Lead counsel addressed defendants' affirmative defense of loss causation, believing that the defendants likely would claim reliance on the assurances of others and would argue that other factors like the subprime crisis, not their alleged misrepresentations and omissions, caused the classes' harm. Finally, lead counsel thought it likely that defendants would argue that almost all of the lead plaintiffs knew the risk they were taking when they bought their notes and some jurors may not sympathize with the class if this is argued. The risks of establishing liability and damages weigh in favor of approving the settlement.

E.    Ability of the Defendants to Withstand a Greater Judgment

The defendant's ability to withstand a greater judgment is only relevant when a reasonable estimate of a judgment would move the defendant towards a critical financial threshold, i.e. forcing the defendant to file bankruptcy. This factor seems appropriate in either limited fund class actions under Rule 23(b)(1)(B) or when the defendant faces large verdicts in multiple cases.

In this case, the action against ABFS was stayed because it went into bankruptcy immediately following the filing of this lawsuit. Although the settlement of $16,676,500 is a small amount relative to the noteholders' losses of over $500 million, I can estimate that a greater judgment would move the individual defendants towards bankruptcy. The settlement and the trustee's settlement consumed virtually all the available directors and officers' insurance. It has been represented and confirmed through interviews and financial disclosures that the individual defendants, Santilli's estate and Mandia, have very few reachable assets to supplement the Settlement more than the $25,000 and $10,000 paid, respectively, from their own pockets. It was

represented at the hearing that the individual defendants also had their net worth in these notes. Nothing shows that further proceedings would result in a larger recovery for the class. Multiple cases are still pending involving the issues in this matter. Continuing to trial in the hopes of obtaining a higher penalty would merely deplete the insurance policy proceeds and increase the risk that the proceeds will further deplete due to the litigation costs of the other pending cases, leaving the class, if successful, with a lesser judgment, not a greater one. This factor weighs heavily in favor of settlement.

F.     The Range of Reasonableness Factors

"The last two Girsh factors ask whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." In re Prudential, 148 F.3d at 322. The settlement should represent a discount from the best possible judgment because the class is avoiding litigation risks. Id. The starting point for this analysis is the "economic valuation of the proposed settlement." See In re Aetna Sec. Litig., 2001 WL 20928, at *11 (E.D. Pa. Jan.4, 2001). The value of the settlement to each class member represents a reasonable discount from the best possible judgment if they were to prevail after a trial.

Although the losses the noteholders incurred are significant and a verdict may therefore have represented an amount greatly higher than the settlement amount, the greater amount would be uncollectible. The insurance carrier provided almost the entire amount of the policy to the class and trustee, and this amount will only decrease if litigation continues. Weighing this factor in favor of the settlement stems from providing the most money possible to the class as soon as possible without the risk of recovering less.

G.     Arm's Length Negotiations and Experienced Counsel

A court should give significant weight to the opinion of experienced counsel that the settlement is in the best interests of the class. See, e.g., Austin v. Pa. Dep't of Corrections, 876 F. Supp. 1437, 1472 (E.D. Pa. 1995); Dominion Bridge Corp., 2007 WL 1101272, at *6-7. The biographies of the lawyers and firms representing the class show extensive experience in complex securities law class actions. This experience weighs in favor of finding that the proposed settlement was entered into in good faith and at arm's length and should be approved.

II.    Plan of Allocation

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole; the distribution plan must be fair, reasonable and adequate." In re Ikon, 194 F.R.D. at 184 (citation omitted); Dominion Bridge Corp., 2007 WL 1101272, at *7. "In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable." Id. The plan of allocation in this case is that claimants are to receive his, her or its *pro rata* share of the net settlement amount based on the total amount ABFS owed them at the time of bankruptcy for notes bought or rolled over after January 18, 2002.

Class members objected to the plan of allocation. Class members, like Peter Mathus,[7] Thelma M. Boucher, Joan Bryan, John Trolio, Mireille Tinawy, David Banach, Gerhard and Laurel Hoffman, Deborah Schulte, Charles and Lillian Menige, Michael Mezey, Moses Walker, Sergio Gallina, Helen Cortez, Raymond D. Benson and Elaine Brown, think that notes should reeeive preferential treatment if they are preferred stock or collateralized, a timely redemption

---

[7] Mr. Mathus also complains about inaccuracies in his Form 1099 for 2004 which caused him loss. This settlement involves securities law violations in Registration Statements, not 1099 Forms.

was requested, they were the result of the exchange offers, they were IRA funds or they matured

prior to bankruptcy. One objector proposed that every class member get a flat percentage of the

settlement. Other objectors, namely Vineta Sylvester, Moss Walker and Panna, Rajendra, Saurin,

and Jyoti Shah, objected to not paying persons who purchased notes prior to the class period

which were not rolled over during the class period and to the limitation of not paying claims less

than $10. The harm to the noteholders resulted from the same purchasing of notes pursuant to

the registration statements at issue. It would be unjust to other noteholders who were similarly

harmed to give preferential treatment to the above requests for the same harm. Some of the

preferential treatment requested may be addressed in bankruptcy law, but here it is fair and

reasonable to avoid distinctions amongst noteholders. Moreover, the class period cannot extend

earlier than January 2002 because of the statute of repose, and for administrative reasons it does

not make sense to cut checks for less than $10. Thus, the plan is fair, reasonable and adequate.

I.      Adequacy of the Notice

        The due process demands of the Fifth Amendment and the Federal Rules of Civil

Procedure require adequate notice to class members of a proposed settlement. In re Aetna, 2001

WL 20928, at *5. "In the class action context, the district court obtains personal jurisdiction over

the absentee class members by providing proper notice of the impending class action and

providing the absentees with the opportunity to be heard or the opportunity to exclude

themselves from the class." In re Prudential, 148 F.3d at 306. The due process requirements of

the Fifth Amendment are satisfied by the "combination of reasonable notice, the opportunity to

be heard and the opportunity to withdraw from the class." Id. The notice must be "'reasonably

calculated under all the circumstances, to apprise interested parties of the pendency of the action

and afford them an opportunity to present their objections.'" Lachance v. Harrington, 965 F. Supp. 630, 636 (E.D. Pa. 1997), quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

Moreover, "in a settlement class maintained under Rule 23(b)(3), class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e)." Bradburn Parent Teacher Store, Inc. v. 3M (Minn. Mining and Mfg. Co.), 513 F. Supp.2d 322, 328 (E.D. Pa. 2007). Rule 23(e)(2) provides that class members must receive the "best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B). Rule 23(c)(2) also requires that "the notice indicate an opportunity to opt out, that the judgment will bind all class members who do not opt out and that any member who does not opt out may appear through counsel." Bradburn Parent Teacher Store, 513 F. Supp.2d at 328, citing Fed.R.Civ.P. 23(c)(2).

In addition to the requirements of Rule 23(c)(2), Rule 23(e) "requires that notice of a proposed settlement must inform class members: (1) of the nature of the pending litigation; (2) of the settlement's general terms; (3) that complete information is available from the court files; and (4) that any class member may appear and be heard at the Fairness Hearing." Id. I should consider both "the mode of dissemination and its content to assess whether notice was sufficient." Id. Although the "notice need not be unduly specific . . . the notice document must describe, in detail, the nature of the proposed settlement, the circumstances justifying it, and the consequences of accepting and opting out of it." Id., citing In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prod. Liab. Litig., 369 F.3d 293, 308-10 (3d Cir. 2004).

I find that the notice provided in this case satisfies the requirements of due process and

19

the Federal Rules of Civil Procedure. Pursuant to the settlement agreement and my September 26, 2008 order, the Certified Public Accounting firm of Heffler, Radetich & Saitta L.L.P. arranged for the mailing of the "Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Costs and Hearing on November 3, 2008" with an attached "Proof of Claim and Release Form and Substitute Form W-9." The mailing list was an updated version of the list used to send the "Notice of Pendency of Class Action" which corrected, if possible after Heffler's research, any addresses returned as undeliverable. The mailing list also included all persons or entities who contacted lead counsel after the initiation of litigation.

Additionally, lead counsel had Heffler publish the "Summary Notice of Proposed Class Action Settlement and Settlement Hearing" on October 2, 2008 in USAToday and the PR Newswire. The trustee also included information concerning the Settlement in this litigation on his website www.abfsonline.com. As a result of these efforts, Heffler sent 29,190 copies of this notice to persons identified as class members. I find that these efforts to disseminate notice were the best practicable. See <u>Zimmer Paper Prods., Inc. v. Berger & Montague</u>, 758 F.2d 86, 90 (3d Cir. 1985), noting that "in the usual situation first-class mail and publication in press fully satisfy the notice requirements of both Fed.R.Civ.P. 23 and the due process clause."

I also find the content of the notice to be adequate under the due process clause and Rule 23. The notice describes the nature and background of this action and defines the class, class claims and the affect on legal rights for responding or not responding. It summarizes the terms of the settlement including information relating to the settlement amount, the release provisions, and the attorneys' fees, expenses and lead plaintiffs' expenses. The notice also described the settlement in the bankruptcy proceedings and states the hope that there will be additional

recoveries against other defendants. The notice explains why plaintiffs believe this is a good settlement. The notice also describes the proposed plan of allocation. The notice informed the class members of the time and date of the hearing, and advised them of their right to object to the settlement and appear at the hearing to voice those objections. The notice includes the contact information of the claims administrator. The notice also provided the "Proof of Claim and Release Form and Substitute Form W-9." After reviewing the notice, I conclude that the substance, like the method of dissemination, is sufficient to satisfy the concerns of due process and Rule 23. See In re Prudential, 148 F.3d at 328.

The Girsh factors favor approving the settlement. The settlement agreement and the proposed plan of allocation will be approved because it is adequate, fair and reasonable for all class members. Additionally, the notice was adequate.

## II.     MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS

Federal Rule of Civil Procedure 23(h) provides that "[i]n an action certified as a class action, the court may award reasonable attorneys fees and nontaxable costs authorized by law or by agreement of the parties . . . ." Fed.R.Civ.P. 23(h). Lead counsel requests an award of attorneys' fees in the amount of $4,898,866 which is 30% of the settlement fund less the holdback and costs totaling $16,329,553. Lead plaintiffs request reimbursement of $267,946.73 for litigation costs and $37,868.00 for lead plaintiffs' "expenses." Lead counsel requests interest on the attorneys' fees and litigation costs at the same rate earned by the settlement fund.  A.

### Attorneys' fees

The Supreme Court explained the basis of counsels' right to move for an award of attorneys' fees from a common fund in Boeing Co. v. Van Gemert, 444 U.S. 472 (1980):

21

A litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The common-fund doctrine reflects the traditional practice in courts of equity, and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees. The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

Id. at 478.

"Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process." Fed.R.Civ.P. 23(h), advisory committee's note. In ruling on a motion for award of attorneys' fees, I have two goals. First, I seek to protect the interests of class members by "acting as a fiduciary for the class." In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 307 (3d Cir. 2005), citing In re Cendant, 264 F.3d at 231. My fiduciary role arises from a recognition of the potential economic conflict of interest between class members seeking to maximize recovery and lawyers seeking to maximize fees. In re Cendant, 264 F.3d at 254-55. The Court of Appeals has explained that the "divergence in [class members' and class counsel's] financial incentives ... creates the 'danger ... that the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment for fees.'" In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001), quoting In re GM Truck, 55 F.3d at 820. Consequently, "the danger inherent in the relationship among the class, class counsel, and defendants 'generates an especially acute need for close judicial scrutiny of fee arrangements' in class action settlements.'" Id., quoting In re GM Truck, 55 F.3d at 820.

Second, I seek to protect the public interest and, with it, the integrity of the judicial

22

system. It is important to avoid awarding "windfall fees" and any appearance of having done so for the integrity of the judicial system, legal profession and Rule 23. Stop and Shop Supermarket Co., et al. v. Smithkline Beecham Corp., 2005 WL 1213926, at *8 (E.D. Pa. May 19, 2005). I must therefore heed the admonition of the Supreme Court in Trustees v. Greenough, 105 U.S. 527 (1881), advising that fee awards under the equitable fund doctrine were proper only "if made with moderation and a jealous regard to the rights of those who are interested in the fund." City of Detroit v. Grinnell Corp., 495 F.2d 448, 469 (2d Cir. 1974), quoting Trustees v. Greenough, 105 U.S. 527, 536 (1881), abrogated on different grounds by Goldberger v. Integrated Resources, Inc., 204 F.3d 43 (2d Cir. 2000).

Keeping these two goals in mind, I "must thoroughly review fee petitions for fairness." In re Aetna, 2001 WL 20928, at *13, citations omitted. Although the ultimate decision as to the amount of attorneys' fees" is within my discretion so long as I employ the correct standards and procedures and make findings of fact not clearly erroneous, I must clearly set forth my reasoning. In re AT & T Corp., 455 F.3d 160, 163-64 (3d Cir. 2006).

"Attorney[s'] fees are typically assessed through [use of] the percentage-of-the-fund method or through the lodestar method." In re AT & T Corp., 455 F.3d at 164. "The percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" In re Rite Aid, 396 F.3d at 300, quoting In re Prudential, 148 F.3d at 333. The Court of Appeals has recommended that I cross-check the reasonableness of the result yielded under the percentage-of-recovery method by also applying the lodestar method. In re AT & T Corp., 455 F.3d at 164. However, "[t]he lodestar cross-check, while useful, should not displace [my] primary reliance on

the percentage-of-recovery method." Id. I will analyze the reasonableness of the attorneys' fees requested accordingly.

### 1. Percentage-of-Recovery method

The percentage of recovery method first requires calculating "the percentage of the total recovery that the proposal would allocate to attorneys' fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case." In re Cendant, 264 F.3d at 256. The Court of Appeals has directed that I use the following seven factors in determining whether a percentage of recovery fee award is reasonable:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000); see also In re Rite Aid, 396 F.3d at 301. Although I should "engage in robust assessments of the fee award reasonableness factors when evaluating a fee request," these factors are not to be applied in a formulaic manner. In re Rite Aid, 396 F.3d at 301-02.

### a. The size of the fund and number of persons benefitted

Plaintiffs' counsel have obtained a settlement of $16,767,500 on behalf of the settlement

class, which is made up of approximately 29,000 noteholders. As of October 23, 2008, there were 5,372 proof of claim forms. The estimated total damages to all noteholders is over $500 million. Consequently, the settlement fund amounts to approximately 2.5% of total damages to the settlement class. Although the 2.5% recovery is within the range of other settlements in complex class action lawsuits, it is in the lower range of typical recoveries in complex securities class actions. See In re Cendant, 264 F.3d at 231, noting that typical recoveries in complex securities class actions range from 1.6%-14% of estimated damages; In re Linerboard Antitrust Litig., 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004), collecting cases in which courts have approved settlements of 5.35% to 28% of estimated damages in complex antitrust actions. Although class counsel benefitted a large number of people with this settlement, what they will receive is very small compared to their losses. Thus, while this recovery may be comparable with other cases, this factor weighs against the percentage of recovery sought as an award of attorneys' fees in this case because such a recovery would take even more away from a class that is already receiving so little.

### b. Objections

The notice provided in this case informed class members that counsel sought an award of up to 30% of the settlement fund as attorneys' fees in this case. A small number of objections were received regarding the attorneys' fees request even when compared to the 5,732 proof of claim forms received as of October 23, 2008 instead of the 29,000 potential class members.

However, some objections in a case like this may reflect unfamiliarity with the legal system and absence of individual counsel. See In re Linerboard Antitrust Litig., 2004 WL

1221350, at *5 (E.D. Pa. June 2, 2004). However, some of the objections received with respect to attorneys' fees were sent by counsel for individual class members. Additionally, the Court of Appeals has cautioned that in cases involving securities litigation, an assumption that silence constitutes tacit consent "understates potential objectors since many shareholders have small holdings or diversified portfolios, ... and thus have an insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's *pro rata* benefit." In re GM Truck, 55 F.3d at 812, quoting Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1313 n.15 (3d Cir. 1995) (citation omitted). Thus, the limited objections do not weigh in favor of approving the attorneys' fees because many of the class members are unsophisticated, have varying investments and may not have the ability to object if appropriate.

While there are relatively few objections, the substance of and concerns raised in these objections are valid. The objections from David Banach, Robert Favela, John Garda, Dorthy Kleinworth, James McCarthy, R.W. Moore, Harvey and Jean Singer, Malkait Mannan, and Brook focus on the percentage requested for attorneys' fees of 30% being excessive in comparison to the 2.5% the class members will recover. The objections have merit in arguing that, when so little is available to cover the losses of the class, such a large percentage should not go to attorneys' fees to further decrease the classes' recovery. Class counsel explained to objectors that the settlement should be approved in part because more money may be available in other cases and the same is true for attorneys' fees. Thus, this factor does not weigh in favor of approving the requested attorneys' fees.

c. The skill and efficiency of plaintiffs' counsel

26

The skill and efficiency of plaintiffs' counsel is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." In re Ikon, 194 F.R.D. 166 at 194, citation omitted. Here, plaintiffs' counsel are highly experienced in complex securities class action litigation as evidenced by the attorneys' biographies filed with the Court. As discussed above, they have obtained the best possible settlement for the class considering the complexity and difficulties of this case, and the related bankruptcy case. They survived in part a motion to dismiss and a motion for judgment on the pleadings. Defense counsel commented at the hearing that the settlement would not have been possible without class counsel's high quality of advocacy. Accordingly, I find that this factor favors approval of the percentage of recovery requested as a fee in this case.

### d. Complexity and duration of the litigation

This litigation presented enormously complex legal and factual securities issues including the interplay of bankruptcy, issuing notes without a broker, exchange offers, securitization of subprime mortgages, valuation and accounting issues. Although the parties have been actively litigating this action for more than three years, in the absence of settlement complex legal and factual issues would remain to be decided in this case including motions for summary judgment and other pre-trial motions. As discussed above, it is likely defendants would strongly contest liability and damages. Given the enormous amounts of money at stake and the unlikelihood of recovering a larger award, and the vigorous advocacy of counsel for both parties over the course of this litigation, it can reasonably be expected that the non-prevailing party would file post-trial

27

motions and an appeal. Consequently, it is reasonable to expect that this case would have continued for several more years absent settlement. Moreover, the time dedicated and the number of participants involved in the mediation supports the complexity of this litigation. Accordingly, I find that this factor favors approval of the percentage of recovery requested.

e. Risk of nonpayment

This action also presented considerable risk of non-payment. As discussed above, plaintiffs recognize that they faced potentially insurmountable barriers to establishing liability. Lead counsel acknowledges the difficulties of proving that the registration statements contained material misrepresentations and omissions and in dealing with defendants' affirmative defenses.

A risk also existed that even if a larger recovery would be awarded after trial it would not be paid. Defendants' inability to pay more than offered at the settlement is supported by their financial statements. The funds available from the insurance carrier were also at risk of not being available. Defense expenses had already consumed $5 million of the policy at the time of settlement. Additionally, the risk existed that the carrier would deny coverage claiming defendants engaged in willful misconduct.

Moreover, this action was riskier than many other securities class actions because there was no prior government investigation or prior finding of civil or criminal liability based on the alleged securities violations. I therefore find that this factor favors approval of the percentage of recovery requested as a fee in this case.

f. The amount of time devoted to this case

Plaintiffs' counsel expended 6,859.75 hours on this action excluding work performed in the pending related action against BDO and work performed in support of the application for

28

attorneys' fees and expenses. Counsel dedicated a significant number of hours to achieving this result and therefore this factor weighs in favor of the percentage of recovery requested as a fee.

### g. Awards in similar cases

This factor requires me to compare the percentage of recovery requested as a fee in this case against the percentage of recovery awarded as a fee in other common fund cases in which the percentage of recovery method, rather than the lodestar method, was used. In re Cendant Corp. PRIDES Litig., 243 F.3d at 737. Percentages awarded have varied considerably but most fees appear to fall in the range of nineteen to forty-five percent. In re Ikon, 194 F.R.D at 194. The median award in class actions is approximately twenty-five percent but awards of thirty percent are not uncommon in securities class actions. Id., citing Computron, 6 F. Supp.2d at 322; Ratner v. Bennett, 1996 WL 243645, at *8 (E.D. Pa. May 8, 1996); In re Greenwich Pharmaceutical Sec. Litig., 1995 WL 251293, at *6 (E.D. Pa. Apr. 26, 1995); In re Novacare, 1995 WL 605533, at *9. Some courts have used twenty-five percent in cases with multi-million dollar settlements as a "benchmark ... in order to prevent a windfall to counsel." Erie County Retirees Assoc. v. County of Erie, Pa., 192 F. Supp.2d 369, 381 (W.D. Pa. 2002).

The awards in cases with settlements of similar size are comparable to the attorneys' fees requested in this case. See e.g., Cullen v. Whitman Med. Corp., 197 F.R.D. 136 (E.D. Pa. 2000), approving attorneys' fees equaling approximately thirty-three percent of a $7.3 million settlement fund; In re Rent-Way Securities Litig., 305 F. Supp.2d 491 (W.D. Pa. 2003), approving a $25 million settlement and awarding $6.25 million in attorneys' fees which was approximately twenty-five percent of the settlement; In re Corel Corp. Inc. Sec. Litig., 293 F. Supp.2d 484 (E.D. Pa. 2003), approving a $7 million settlement and awarding attorneys' fees of $2.3 million; In re

Computron Software, Inc., 6 F. Supp.2d 313 (D. N.J. 1998), approving attorneys' fees equaling approximately twenty-five percent of a $15 million settlement; Lazy Oil Co. v. Wotco Corp., 95 F. Supp.2d 290 (W.D. Pa. 1997), awarding attorneys' fees equaling approximately twenty-five percent of a $18.9 million settlement.

The requested percentage of 30% is within the varying range. This factor weighs in favor of approving the percentage of recovery requested as a fee. However, "[t]hese varying ranges of attorneys' fees confirm that a district court may not rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." In re Cendant Corp. PRIDES Litigation, 243 F.3d at 736.

### h. Conclusion of Gunter Factors

After reviewing the Gunter factors, I conclude that the size of the fund and the objections do not support the attorneys' fees requested in this case. I further find that these factors are not outweighed by the remaining Gunter factors, the skill and efficiency of counsel, the complexity and duration of the litigation, the amount of time put into the case, awards in similar cases and the risk of non-recovery, especially considering the circumstances of this case and that a lower percentage award would also be within the range of awards in similar cases. Consequently, I conclude that the Gunter factors do not support plaintiffs' request for an award of 30% of the settlement fund as attorneys' fees in this case.

### 2. Lodestar cross-check

The purpose of the lodestar cross-check echoes the second goal of the Court's analysis of motions for attorneys' fees: the avoidance of "windfall fees." See Grinnell, 495 F.2d at 469. The lodestar cross-check is performed to "ensure that the percentage approach does not lead to a

fee that represents an extraordinary lodestar multiple." In re Cendant Corp. Sec. Litig., 404 F.3d 173, 188 (3d Cir. 2005). "The goal of this practice is to ensure that the proposed fee award does not result in counsel being paid a rate vastly in excess of what any lawyer could reasonably charge per hour, thus avoiding a 'windfall' to lead counsel." In re Cendant, 264 F.3d at 285.

"The lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services, based on the given geographical area, the nature of the services provided, and the experience of the attorneys." In re Rite Aid Corp., 396 F.3d at 305. "The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work," id. at 305-06, and "to reward an extraordinary result or to encourage counsel to undertake socially useful litigation," In re Aetna, 2001 WL 20928, at *15. To perform the cross-check, district courts must divide the proposed fee award by the lodestar calculation, which will yield a lodestar multiplier. In re AT & T Corp., 455 F.3d at 164. This calculation "need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records. Furthermore, the resulting multiplier need not fall within any pre-defined range, provided that the District Court's analysis justifies the award." In re Rite Aid, 396 F.3d at 306-07, footnotes and citations omitted. It is appropriate for the court to consider the multipliers utilized in comparable cases. Id. at 307 n.17.

To calculate the lodestar amount, I reviewed the billing summaries provided by plaintiffs' counsel. After adding together the hours of work performed by plaintiffs' counsel and multiplying this total by the average hourly rate charged, this Court calculated a lodestar of $2,876,810.00 for all attorneys participating in the case.

31

To compute the lodestar multiplier, I must divide the requested attorneys' fees award by the lodestar amount. An award of the requested fees of $4,898,866 would result in a lodestar multiplier of 1.7. The Court has recognized that multipliers "ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." In re Cendant Corp. PRIDES Litig., 243 F.3d at 742, quoting In re Prudential, 148 F.3d at 341. Thus, this lodestar multiplier falls within the range approved for reasonable attorneys' fees awards.

However, after thorough review of the Gunter factors in this case, I conclude the percentage of the common fund requested as a fee is not fair and reasonable when the class members stand to recover only 2.5%. As I have determined that I will not approve the 30% fee award sought by lead counsel, I must reconsider the request for fees under the percentage-of-recovery method. In re Rite Aid, 396 F.3d at 306.

I find that lead counsel obtained the best result possible in a complex and risky case. However, the size of the fund is insubstantial compared to the class' damages. The objections to the attorneys' fees addressed this issue. Considering this and recognizing the time, skill and experience brought by counsel to the litigation, I find that 25% of the settlement fund results in a fair and reasonable award of attorneys' fees in this action of $4,082,388.25. This amount is $816,477.75 above the lodestar and creates a lodestar multiplier of 1.42. The reduction of the fee from 30% to 25% is strongly influenced by the size of the settlement fund compared to the significant losses the class members have suffered. This reduction also takes into consideration that this amount is still above the lodestar amount and therefore an incentive still exists for counsel to undertake such complex and risky litigation. A 25% fee compensates counsel for their time and effort, rewards them for the result achieved, and provides adequate incentive to pursue

32

similar cases.

Having analyzed the <u>Gunter</u> factors and the lodestar cross-check in this case, and for the reasons stated above, I will award attorneys' fees in the amount of $4,082,388.25.

III.    Reimbursement of Attorneys' Costs

Lead counsel seeks reimbursement for litigation expenses of $267,946.73 plus interest at the same rate as earned by the settlement fund. The notice provided that lead counsel would seek reimbursement of not more than $325,000 in litigation expenses. A few objections, mainly an objection by Harvey and Jean Singer, stated that these expenses were excessive and unreasonable in relations to the proportion of the settlement available to the noteholders.

"Attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable litigation expenses from the fund." <u>In re Aetna, Inc. Sec. Litig.</u>, 2001 WL 20928, at *13 (E.D. Pa. Jan. 4, 2001), <u>citing In re Ikon Office Solutions Inc. Sec. Litig.</u>, 194 F.R.D. 166, 192 (E.D. Pa. 2000). Courts in this circuit have awarded lead counsel costs for filing fees, expert consulting, telephone and fax charges, copying charges, computer assisted research, travel expenses and mailing charges where affidavits and billing records have been provided that demonstrate the reasonableness of the requested costs. <u>See e.g.</u>, <u>Perry v. FleetBoston Financial Corp.</u>, 229 F.R.D. 105, 124 (E.D. Pa. 2005), awarding $4,377.02 for these costs after reviewing "submitted affidavits and detailed billing records"; <u>In re SmithKline</u>, 751 F. Supp. at 534, awarding $202,460 for aggregate costs based on the "law firms' supporting records and affidavits." As other courts have noted, "'[t]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of ... *reasonable* litigation expenses from that fund.'" <u>Ikon</u>, 194 F.R.D. at 192, <u>quoting Lachance v. Harrington</u>,

33

965 F. Supp. 630, 651 (E.D. Pa. 1997), emphasis in original.

In class counsels' declarations, counsel from each law firm testified that the following un-reimbursed out-of-pocket expenses are an accurate record of the expenses incurred as reflected in expense vouchers and check records: delivery and freight, class notice costs, duplication costs, online legal research, travel, meals, experts, telephone, fax services, transcripts, postage, messenger, mediator, filing and court fees, service fees, transportation and press releases. Since these categories are considered expenses that are appropriate to reimburse in this circuit and the expenses appear to be reasonable, I see no reason to disallow them. I find that the requested litigation expenses are reasonable.

IV.   Reimbursement of "Expenses" to Lead Plaintiffs

Lead plaintiffs ask that I award $37,868.00 to lead plaintiffs as reimbursement for costs and expenses incurred from their service as a class representative for this case. Specifically, in declarations accompanying their second submissions,[8] lead plaintiffs request the following amounts in reimbursement: John Malack $4,794.00, Michael Rosati $6,600.00, Virgil Magnon $10,170.00, Henry Munster $352.00, and S.S. Rajaram and Hayward Pediatrics, Inc. $3,200.00. The settlement notice provided that a fee and expense award, which would not exceed $50,000, would be sought. The objections filed generally note that the awards are excessive and unreasonable in relation to the proportion of the settlement amount for the noteholders or state an objection to the expenses without reason.

---

[8] In the declarations accompanying their second motion for lead plaintiffs' expenses, lead plaintiff Henry Munster amended his request from 19 hours to 22 hours and his request from $304.00 to $352.00 and lead plaintiff S.S. Rajaram and Hayward Pediatrics, Inc. amended their request from 80 hours at $200.00/hour to 16 hours.

The Private Securities Litigation Reform Act (PSLRA) states that class representatives shall "not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4)." 15 U.S.C. § 78u-4(a)(2)(A)(vi). Paragraph (4) provides that:

> [t]he share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

15 U.S.C. § 78u-4(a)(4).

Lead plaintiffs state that they incurred these costs by performing duties related to this action including participating in conference calls with class counsel and other lead plaintiffs, reviewing documents and letters sent by class counsel, and preparing for and participating in depositions. The following hours and rates were submitted by the Lead Plaintiffs: John Malack – 94 hours at $51.00 per hour; Michael Rosati – 132 hours at $50.00 per hour; Virgil Magnon – 226 hours at $45.00 per hour; Henry Munster – 22 hours at $16.00 per hour; and S.S. Rajaram and Hayward Pediatrics, Inc. – 16 hours at $200.00 per hour.

In my view, not all of these submissions qualify as costs and expenses. As noted in Smith v. Dominion Bridge Corp., WL 1101272, at *12 (E.D. Pa. 2007), costs and expenses must be justified with evidence of actual expenses incurred, lost wages, lost vacation time or lost business opportunities. Here, Muster and Rajaram have demonstrated and justified their lost business opportunities from time spent working as a class representative in their declarations; however, lead plaintiffs Malack, Rosati and Magnon have not. As they are retired and so have no

35

lost business opportunities, lost wages or lost vacation time and they have submitted no expenses incurred, they have failed to demonstrate that they have incurred any "reasonable costs and expenses" that can be awarded under PSLRA. While their time certainly has value, the PSLRA does not permit reimbursement corresponding to what they earned at their former positions. Though lead counsel correctly notes that many judges, including myself, have awarded compensation that is not justified under the PSLRA, Dominion Bridge correctly states the law. Lead counsel also notes several cases in which lead plaintiffs received incentive awards, but they are not apposite here. Incentive awards are permitted for lead plaintiffs in RICO and civil rights cases where plaintiffs justifiably fear retribution or are in danger because of their willingness to step forward. See e.g. Denney v. Jenkens & Gilchrist, 230 F.R.D. 317, 355 (S.D. N.Y. 2005). There is no such danger associated with serving as the lead plaintiff in securities litigation.

I will approve the following costs and expenses for lead plaintiffs: Henry Munster $352.00 and S.S. Rajaram and Hayward Pediatrics, Inc. $3,200. The total costs and expenses for lead plaintiffs is $3,552.00.

An appropriate Order follows.

36

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE AMERICAN BUSINESS FINANCIAL SERVICES INC. NOTEHOLDERS LITIGATION | : Master File No. 05-232 : : : |
| This Document Relates To All Actions | : |

## ORDER

All capitalized terms herein have the meanings set forth in the Settlement Agreement.

On November 3, 2008, following Notice to all parties and Notice to the Class Members as described herein, a Final Hearing was held before this Court to consider: (1) Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation (the "Settlement Approval Motion"); (2) the motion for an Award of Fees and Costs to Plaintiffs' counsel ("Fees and Costs Application"); (3) the motion for the payment of Plaintiffs' Expense Awards; ("Plaintiffs' Application"); and (4) Objections filed by Class Members, and Plaintiffs' Reply thereto, if any.

1.    Pursuant to those Motions, the Court must:

a.    determine whether the terms and conditions of the Settlement Agreement dated September 12, 2008 (the "Settlement Agreement") are fair, reasonable and adequate for the settlement of all claims asserted by Lead Plaintiffs and the Class in the Amended Complaint in this Action, including the release of the Released Parties, and should be approved;

b.    determine whether judgment should be entered dismissing the Amended Complaint on the merits and with prejudice in favor of the Noteholder Defendants and as against all persons or entities who are Members of the Class herein who have not requested exclusion therefrom;

c.    determine whether to approve the Plan of Allocation as a fair and reasonable method to allocate the Net Settlement Fund among the Class Members;

d.    determine whether and in what amount to approve the Fees and Costs Application;

e.    determine whether and in what amount to approve the application for Plaintiffs' Expense Awards; and

f.    determine whether the Class Members' Objections, if any, have merit.

2.    The Court has considered all matters submitted to it at the hearing and otherwise. It appears that a Notice of the hearing substantially in the form approved by the Court was mailed to all persons or entities reasonably identifiable, who suffered damage as a result of their purchase of Notes from American Business Financial Services, Inc. ("American Business") during the Class Period, and that a Summary Notice of the hearing substantially in the form approved by the Court was published in *USA Today* pursuant to the specifications of the Court and was also disseminated over the *PR Newswire*. The Court has considered and determined the fairness and reasonableness of the Settlement, the Plan of Allocation, the Fees and Costs Application, and the Plaintiffs' Application, and has considered all Objections of Class Members.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

3.    The Court has jurisdiction over the subject matter of the Action, the Noteholder Plaintiffs, all Class Members, and the Noteholder Defendants.

4.    The Court has previously certified a Class of all persons who suffered damage as a result of their purchase of Notes from American Business during the Class Period pursuant to

2

Registration Statements, including prospectuses included as exhibits and all supplements thereto, that became effective on or about October 16, 2001, October 3, 2002 and November 7, 2003, respectively. Excluded from the Class are Noteholder Defendants, members of the immediate family of each of the Noteholder Defendants, any entity in which a Noteholder Defendant has a controlling interest and the heirs of any excluded person. Also excluded from the Class are all persons whose names appear on the attached Opt-Out List, including those who previously requested exclusion from the Class, and did not withdraw that request.

5.    Pursuant to Fed. R. Civ. P. 23, Noteholder Plaintiffs, John A. Malack, Michael R. Rosati, Virgil Magnon, S.S. Rajaram, M.D., Hayward Pediatrics, Inc. have been certified as Lead Plaintiffs, and Henry Munster as a Class Representative.

6.    Notice of the proposed Settlement of class action and related matters, including Notice of the November 3, 2008 Final Hearing, was mailed to all Class Members who could be identified with reasonable effort. The form and method of notifying the Class of the terms and conditions of the proposed Settlement met the requirements of Rule 23 of the Federal Rules of Civil Procedure, the Securities Exchange Act of 1933, and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995, due process and any other applicable law, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

7.    The Settlement is approved as fair, reasonable and adequate, and the Parties are directed to consummate the Settlement in accordance with the terms and provisions of the Settlement Agreement. Any Objections of Class Members to the Settlement are overruled.

8.    The Amended Complaint is hereby dismissed with prejudice and without costs,

3

except as provided in the Settlement Agreement.

9.      On the Effective Date, the Noteholder Plaintiffs and each Class Member, on behalf of themselves, their successors and assigns, and any other Person claiming (now or in the future) through or on behalf of them, and regardless of whether any such Noteholder Plaintiff or Class Member ever seeks or obtains by any means, including, without limitation, by submitting a Proof of Claim, any distribution from the Net Settlement Fund, (i) fully, finally and forever release, relinquish, remise and discharge all claims, including, without limitation, all Released Claims, against the Released Parties, (ii) by operation of the Final Order, fully, finally, and forever release, relinquish, remise and discharge the Released Parties from all claims, including, without limitation, Released Claims, arising out of or in connection with the institution, prosecution, or assertion of the Action, (iii) covenant not to threaten, demand, or sue the Released Parties or any of them  regarding any action or proceeding of any nature with respect to the Released Claims, and (iv) are forever enjoined and barred from asserting the Released Claims, against the Released Parties or any of them in any action or proceeding of any nature, regardless of whether any such Noteholder Plaintiffs and/or each Class Member ever seeks or obtains any distribution from the Net Settlement Fund, whether or not such Noteholder Plaintiffs and/or each Class Member executed and delivered a Proof of Claim, whether or not such Noteholder Plaintiffs and/or each Class Member have filed an objection to the Settlement or to their claim being rejected as provided in this Agreement, the proposed Plan of Allocation, or any application by Plaintiffs' Counsel for an award of Attorneys' Fees and Costs and whether or not the claims of such Noteholder Plaintiffs or Class Members have been approved or allowed or such objection has been overruled by the Court.

4

10.    In accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77k(f)(2)(A) and 15 U.S.C. §78u-4(f)(7)(A)-(B) and other statutory or common law rights, the Released Parties, and each of them, are hereby fully, finally and forever released and discharged from all claims for contribution, indemnity or other federal or state law causes of action that have been brought or may be brought by any Person based upon, relating to, arising out of, or in connection with the matters alleged in the Action. Any final verdict or judgment obtained by or on behalf of any Noteholder Plaintiff or Class Member against any Person other than a Released Party relating to the Released Claims is to be reduced by the greater of (a) an amount that corresponds to the percentage of responsibility of the Released Parties for the loss to any Noteholder Plaintiff or Class Member or (b) the amount paid by or on behalf of the Released Parties to the Noteholder Plaintiffs and Class Members in connection with the Settlement.

11.    The Noteholder Plaintiffs and each Class Member, on behalf of themselves, their successors and assigns, and any other Person claiming (now or in the future) through or on behalf of them, and regardless of whether any such Noteholder Plaintiff or Class Member ever seeks or obtains by any means, including, without limitation, by submitting a Proof of Claim, any distribution from the Settlement Amount, shall not after the Effective Date seek to institute, maintain, prosecute or continue to maintain or prosecute any suit, action or other proceeding, or collect from or proceed against the Released Parties or any of them, based on the Released Claims.

12.    The Noteholder Defendants remise, release and discharge the Noteholder Plaintiffs and the Class Members and each of their estates, heirs, personal representatives,

attorneys, accountants and insurers and the Class (the "Noteholder Releasees") of and from any

and all actions, causes of action, claims, suits, demands, rights, damages, costs, losses,

judgments, debts, obligations and liabilities, whether known or unknown, contingent, liquidated

or unliquidated, which the Noteholder Defendants have or may have against the Noteholder

Releasees arising out of, based upon or relating to the Noteholder Defendants' transactions or

dealings with and/or relationships to American Business, including but not limited to any such

actions, causes of action, claims, suits, demands, rights, damages, costs, losses, judgments, debts,

obligations or liabilities arising out of, based upon, or relating to the Action or the BDO Action.

      13.    With respect to any and all Released Claims, the Settling Parties stipulate and

agree that, upon the Effective Date, they shall be deemed to have, and by operation of the Final

Order shall have, expressly waived the provisions, rights and benefits of any statute, rule or

provision which prohibits the release of Unknown Claims, including California Civil Code

§1542, which provides:

> A general release does not extend to claims which the creditor does
> not know or suspect to exist in his favor at the time of executing
> the release, which if known by him must have materially affected
> his settlement with the debtor.

A Settling Party may hereafter discover facts in addition to or different from those which he, she,

it or they now know or believe to be true with respect to the subject matter of the Released

Claims, but the Settling Parties, upon the Effective Date, shall be deemed to have, and by

operation of the Final Order shall have, fully, finally, and forever settled and released any and all

Released Claims, known or unknown, suspected or unsuspected, contingent or non-contingent,

whether or not concealed or hidden, which now exist, or heretofore have existed, upon any theory

of law or equity now existing or coming into existence in the future, including, but not limited to,

6

conduct which is alleged to be negligent, intentional, with or without malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence of such different or additional facts. The Settling Parties shall be deemed by operation of the Final Order to have acknowledged, that the foregoing waiver was separately bargained for and a key element of the settlement of which this release is a part.

14.     Noteholder Plaintiffs and the Class are releasing only the Released Parties and no one else. The Noteholder Plaintiffs, on behalf of the Class, reserve and preserve in full all of their claims and actions against all other individuals and entities, including but not limited to the Noteholder Plaintiffs' claims in the BDO Action. The Noteholder Plaintiffs reserve the option and right to make claims against any and every other person or entity other than the Released Parties, including but not limited to BDO, and to assert that said other persons or entities and not the Noteholder Defendants are liable to the Noteholder Plaintiffs and the Class for the events, matters and damages alleged by the Action and the BDO Action and otherwise alleged.

15.     Neither this Order and Final Judgment, the Settlement Agreement, nor any of its terms and provisions, or any of the negotiations or proceedings connected with it, nor any of the documents or statements referred to therein:

        (a)     is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Parties;

        (b)     is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of the Parties in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal;

        (c)     shall constitute an adjudication or finding on the merits as to the claims of

7

any Party and shall not be deemed to be, intended to be or construed as an admission of liability, in any way on the part of any Party or any evidence of the truth of any fact alleged or the validity of any claims that have been or could be asserted in the Action. All Parties expressly deny any liability for any and all claims of any nature whatsoever; nor shall anything herein contained constitute an acknowledgment of fact, allegation or claim that has been or could have been made, nor shall any third party derive any benefit whatsoever from the statements made within this Agreement; nor

(d) shall be construed against Notcholder Defendants as an admission or concession that the consideration to be given hereunder represents the amount which could be or would have been recovered after trial.

The Noteholder Defendants may file the Agreement and/or the Final Order in any action that may be brought against them in order to support a defense or counter claim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

16.     The Plan of Allocation is approved as fair and reasonable, and Lead Counsel and the Claims Administrator are directed to administer the Settlement in accordance with its terms and provisions. Any Objections to the Plan of Allocation filed by Class Members are overruled.

17.     Plaintiffs' counsel are hereby awarded 25% of the Payable Amount, less $267,946.73 (or $16,329,554), in fees, which the Court finds to be fair and reasonable, and $267,946.73 in reimbursement of expenses, which fees and expenses shall be paid to plaintiffs' Lead Counsel from the Paid Amount, with interest from the date of deposit of the Paid Amount in Citizens Bank, to the date of payment at the same rate that the Paid Amount earns. These

8

amounts are to be paid pursuant to the procedure set forth in the Settlement Agreement. The award of attorneys' fees shall be allocated among Plaintiffs' Counsel in a fashion which, in the opinion and sole discretion of Plaintiffs' Lead Counsel, fairly compensates Plaintiffs' Counsel for their respective contributions to the prosecution of the Action.

18.     Noteholder Plaintiffs are hereby awarded reasonable costs and expenses, pursuant to 15 U.S.C. 77z(a)(4) as follows: Henry Munster is awarded $352.00; and S.S. Rajaram M.D., Hayward Pediatrics Inc. is awarded $3,200. Such amounts shall be paid from the Paid Amount.

19.     The Court finds that all parties and their counsel have complied with each requirement of Rule 11 of the Federal Rules of Civil Procedure as to all proceedings herein.

20.     Exclusive jurisdiction is hereby retained over the administration, interpretation, effectuation or enforcement of the Stipulation and this Order and Final Judgment, and including the Fee Petition or any other application for fees and expenses incurred in connection with administering and distributing the settlement proceeds to the Class Members, and including any individual objections by Claimants to the rejection of their claim or to the Allocation of the Net Settlement Fund.

21.     Without further order of the Court, the parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

22.     There is no just reason for delay in the entry of this Order and Final Judgment and immediate entry by the Clerk of the Court is expressly directed pursuant to Rule 54(b) of the Federal Rules of Civil Procedure.

November   21   , 2008.

_____
THOMAS N. O'NEILL, JR., J.

9

## IN RE ABFS NOTEHOLDERS LITIGATION

### REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #1<br>JOSEPH HEPINGER<br>MARGURITE SHINSKY<br>544 E 200 ST APT 1 REAR<br>EUCLID, OH 44119 | 05/07/08<br>05/13/08 | $15,000.00 | | |
| #2<br>FRANK W GULLA<br>1 ADLER CIRCLE<br>LUMBERTON, NJ 08048 | 05/08/08<br>05/13/08 | $20,000.00<br>$20,000.00<br>$20,151.39<br>$20,000.00 | 08/06/02<br>12/12/02<br>06/29/04<br>10/05/04 | |
| #3<br>MARY KLEIST<br>2530 BUCKELEW DRIVE<br>FALLS CHURCH, VA 22046 | 05/08/08<br>05/13/08 | $ 1,000.00 | 12/12/03 | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #4<br>RICHARD C ZANE<br>3635 GENESEE PLACE<br>PHILADELPHIA, PA  19154 | 05/10/08<br>05/13/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | |
| #5<br>JANET A HARRISON<br>200 WARDEL ROAD<br>WILMINGTON, DE  19804 | 05/10/08<br>05/13/08 | $52,000.00 | | PURHASES BETWEEN JAN, 18, 2002 AND JAN, 20, 2005 |
| #6<br>EUGENE D MONTRONE<br>701 HIGHLAND AVENUE<br>CLARKS GREEN, PA  18411 | 05/10/08<br>05/13/08 | $ 1,003.02<br>$ 1,033.37 | 06/11/04<br>01/20/05 | |

## REQUESTS FOR EXCLUSION
## RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #7 ROBERT O MARSTON 3502 MEMORIAL DRIVE LOMAR, CO 81052 | 05/10/08 05/13/08 | $ 1,000.00 | 02/20/05 | |
| #8 DONALD A DEVINE DORORTHY V DEVINE 1202 DEXTER ST BLOOMFIELD, CO 80020 | 05/10/08 05/13/08 | $ 1,000.00 | 04/15/04 | |
| #9 ROBERT I SHAFFER 200 W 39TH ST READING, PA 19606 | 05/10/08 05/13/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | PURCHASE DATE 12/12/2002 |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #10<br>STANLEY TRYZBIAK<br>65 SOLANDRA DR<br>ORLANDO, FL 32807 | 05/10/08<br>05/13/08 | $11,000.00 | | |
| #11<br>JEANNE PALEN<br>3418 BERESFORD AVENUE<br>BELMONT, CA 94002 | 05/10/08<br>05/13/08 | $10,000.00<br>$10,000.00 | 05/13/02<br>03/01/04 | |
| #12<br>DOUGLAS E HELM<br>EVELYN HELM<br>239 BETTY CIRCLE<br>REEDSVILLE, PA 17084 | 05/09/08<br>05/13/08 | $29,500.00 | 05/29/03 | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER<br>& NAME AND ADDRESS | POSTMARKED<br>& RECEIVED | PRINCIPAL<br>AMOUNT | PURCHASE<br>DATE | INFORMATION GIVEN<br>BY REQUESTOR |
|---|---|---|---|---|
| #13<br>SUSAN PINA<br>2720 14TH CT<br>PALM HARBOR, FL 34684 | 05/08/08<br>05/13/08 | $25,000.00<br>$15,000.00 | 10/31/03<br>07/20/04 | |
| #14<br>ISENBERG FAMILY TRUST DTA<br>RICHARD & ANGELINE ISENBERG TTEE<br>916 TOWNSHIP LINE RD<br>PLYMOUTH MEETING, PA 19462 | 05/08/08<br>05/13/08 | $ 9,000.00<br>$10,000.00 | 06/13/02<br>04/16/03 | |
| #15<br>CHARLES B KALEMJIAN<br>83 GLENDALE ROAD<br>EXTON, PA 19341 | 05/08/08<br>05/13/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #16 PAUL DIMMICK MARGARETA DIMMICK 618 FOUNTAIN STREET PHILADELPHIA, PA 19128 | 05/13/08 05/14/08 | $10,000.00 | 12/27/02 | |
| #17 JEAN M MARASCO 388 NORTH BURLEY RD ROCHESTER, NY 14612 | 05/12/08 05/14/08 | $ 2,000.00 $ 2,210.92 $ 2,000.00 $ 2,000.00 | 01/20/04 11/28/04 09/13/04 10/18/02 | |
| #18 JAMES D DRISCOLL 724 CHESTNUT LANE YARDLEY, PA 19067 | 05/12/08 05/14/08 | $90,000.00 | | |

## REQUESTS FOR EXCLUSION
## RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #19 BLANCHE A AANERUD 10052 N. 42 DRIVE PHOENIX, AZ 85051 | 05/12/08 05/15/08 | $ 2,151.96 $ 1,000.00 $ 1,000.00 $ 1,000.00 | 03/18/02 04/11/03 11/19/03 02/20/04 | |
| #20 SHIRLEY M JOHNSON 9753 PINE SHORES DR PINE CITY, MN 55063 | 05/12/08 05/15/08 | $ 1,151.96 | 04/22/02 | |
| #21 SONNY LEE 27613 GREENLEAF DRIVE CANYON COUNY, CA 91351 | 05/12/08 05/15/08 | $ 3,000.00 | 01/03/03 | ALSO INVESTED $2000.00 PRIOR TO CLASS PERIOD |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #22<br>RICHARD SLATER<br>PHYLLIS SLATER<br>7426 REDDING RD<br>HOUSTON, TX 77036 | 05/12/08<br>05/15/08 | $14,416.20 | | |
| #23<br>BERNICE L KAPLAN<br>16516 HIAWATHA STREET<br>GRANADA HILLS, CA 91344 | 05/12/08<br>05/15/08 | $ 7,500.00<br>$ 7,500.00<br>$ 5,000.00 | 06/02/03<br>07/01/04<br>10/24/01 | |
| #24<br>LAWRENCE P SKUMMER<br>PO BOX 1028<br>ARLINGTON, VA 22211 | 05/13/08<br>05/15/08 | $15,272.47 | 02/08/03 | |

## REQUESTS FOR EXCLUSION
## RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #25<br>RUTH G WEISSMANN<br>1608 B KILLARNEY CT<br>OCALA, FL 34472 | 05/12/08<br>05/15/08 | $ 2,714.97<br>$ 3,000.00<br>$ 2,000.00<br>$ 2,714.97 | 08/06/02<br>12/24/02<br>04/22/04<br>08/06/04 | |
| #26<br>PHYLLIS SLATER<br>RICHARD SLATER<br>7426 REDDING RD<br>HOUSTON, TX 77036 | 05/12/08<br>05/15/08 | $ 6,583.79 | | |
| #27<br>NORBERT A MROCZENSKI<br>2404 SANDPIPER AVE<br>WAUSAU, WI 54401 | 05/13/08<br>05/19/08 | $ 6,423.00 | 06/16/04 | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #28<br>KAREN A SKELTON<br>JESSE F SKELTON (DECEASED)<br>9320 LANGWOOD DRIVE<br>RALEIGH, NC  27617 | 05/16/08<br>05/19/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | DOCUMENTATION IS<br>NO LONGER<br>AVAILABLE |
| #29<br>HARRY D BUCKNER<br>CAROLYN S BUCKNER<br>325 E CHURCH AVENUE, APT 215<br>TELFORD, PA  18969 | 05/15/08<br>05/19/08 | $10,000.00<br>$10,000.00<br>$ 5,000.00 | 05/29/02<br>02/13/04<br>04/30/04 | |
| #30<br>HANSEN LIVING TRUST DTD 9/8/04<br>ANN M. HANSEN & STEPHEN G. HANSEN<br>TTEES<br>7717 WEST 24TH STREET<br>ST LOUIS PARK, MN  55426 | 05/16/08<br>05/20/08 | $ 1,003.02<br>$ 3,296.14<br>$ 2,221.12 | 09/20/04<br>10/21/04<br>10/22/04 | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #31 JOHN LESLIE FLORENCE LESLIE 1712 WILLOW CIR DR CREST HILL, IL 60403 | 05/17/08 05/20/08 | $ 2,000.00 $ 2,000.00 | 05/27/04 10/25/04 | |
| #32 ROBERT W HOHL EDNA LOIS HOHL 146 BLUEBELL COURT NEW HOLLAND, PA 17557 | 05/19/08 05/21/08 | $ 3,000.00 | | $3000.00 FROM JAN 18, 2002 THROUGH JAN 20, 2005 |
| #33 CAROL OZLANSKI 146 N. LOCUST ST MT CARMEL, PA 17851 | 05/21/08 05/22/08 | 150,000.00 132,000.00 | 01/24/03 03/31/03 | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #34<br>LUIS E NUNEZ<br>960 SUSQUEHANNA RD<br>RYDAL, PA 19046 | 05/21/08<br>05/22/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | PURCHASED THREE (3) NOTES: 01/21/03, 05/21/03 &08/14/04 |
| #35<br>FLORENCE ROCHE<br>8318 JEANES ST<br>PHILADELPHIA, PA 19111 | 05/21/08<br>05/22/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | PURCHASED NOTE ON 03/16/03 |
| #36<br>BRUNO P TRACY<br>DOROTHY A. TRACY<br>1356 ROMANE DR.<br>SAGAMORE HILLS, OH 44067 | 05/21/08<br>05/23/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | NO LONGER HAVE ABFS NOTES, NOT ABLE TO PROVIDE NUMBERS |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #37 AUDREY T FREEMAN 115 VALLEY GREENE CIRCLE WYOMISSING, PA 19610 | 05/21/08 05/23/08 | $ 5,000.00 $ 5,000.00 $ 5,000.00 $ 5,000.00 $ 5,000.00 $ 2,000.00 $ 1,000.00 $ 5,000.00 | 01/03/03 06/05/02 01/11/04 10/31/02 05/30/03 02/09/04 02/26/04 01/28/04 | |
| #38 EWELL D ISAACS PO BOC 9813 NORFOLK, VA 23505 | 05/21/08 05/23/08 | $ 1,000.00 $ 1,000.00 $ 1,000.00 $ 1,000.00 $ 1,000.00 $ 1,000.00 | 07/13/02 07/13/02 04/15/02 05/13/02 02/27/03 01/27/03 | |
| #39 LUIS E NUNEZ 960 SUSQUEHANNA RD RYDEL, PA 19046 | 05/22/08 05/23/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | HAS 3 ABFS NOTES PURCHASED |

## REQUESTS FOR EXCLUSION
## RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #40<br>TIMOTHY J MALLOY (DECEASED)<br>C/O JANE MALLOY (WIDOW)<br>327 FIDLER RD<br>DENNISVILLE, NJ 08214 | 05/23/08<br>05/28/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | HAS NO KNOWLEDGE<br>OR PAPER WORK<br>FOR ABFS |
| #41<br>THERESA K POLEY<br>1174 QUEEN LN<br>APT 1<br>WEST CHESTER, PA 19382 | 05/24/08<br>05/29/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |
| #42<br> ANDERSON FAMILY TRUST, DTD 12/17/90<br>JOSEPHINE M. ANDERSON TTEE<br>1615 LEYCROSS DR<br>LA CANADA, CA 91011 | 05/24/08<br>05/29/08 | $20,000.00<br>$10,000.00<br>$10,000.00 | 08/01/04<br>01/13/04<br>05/01/03 | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #43 JOY WALTERSCHILD 50 KIMBALL RIDGE COURT CATONSVILLE, MD 21228 | 05/23/08 05/29/08 | $ 2,000.00 $ 1,050.72 | 09/03/02 12/31/03 | |
| #44 DAVID ULSTROM 200 SO. PARK ST APT 206 MORA, MN 55051 | 05/22/08 05/29/08 | $ 7,381.05 | 04/04/04 | |
| #45 ESTHER ENGLE 240 WILLIAMSBURG DR APT 3 THIENSVILLE, WI 53092 | 05/27/08 05/30/08 | $ 1,000.00 | 02/02/03 | DOES NOT REMEMBER THE EXACT DATE |

## REQUESTS FOR EXCLUSION

### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #46<br>EDWARD MCMANUS<br>MARY MCMANUS<br>2806 NORWOOD HILLS DR<br>KATY, TX 77450 | 05/23/08<br>05/30/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | |
| #47<br>KRISTIAN SCHUETZ<br>KAREN SCHUETZ<br>1822 E. WAVERLY DRIVE<br>ARLINGTON HEIGHTS, IL 60004 | 06/02/08<br>06/02/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | |
| #48<br>MARY GEDARO<br>67 WINDING WAY<br>PORTLAND, ME 04102 | 05/30/08<br>06/02/08 | $ 2,000.00 | | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|---|---|
| #49 EDMUND A RELLERGERT ELIZABETH J. RELLERGERT 3713 PRIMM STREET ST LOUIS, MO 63123 | 05/30/08 06/02/08 | $ 2,191.52 $ 2,000.00 $ 2,000.00 $ 3,000.00 $ 2,000.00 $ 1,000.00 $ 1,000.00 $ 5,000.00 $ 2,530.73 $ 3,611.36 $ 3,056.48 | 02/10/04 11/24/03 09/23/03 07/09/03 10/28/03 01/26/04 03/01/04 07/20/03 06/15/03 01/09/04 07/12/03 | $ 4,000.00 $ 3,000.00 $ 5,000.00 $ 2,000.00 $ 3,000.00 $ 3,185.49 $ 4,000.00 $ 3,000.00 $ 4,000.00 $ 2,000.00 | 08/28/03 01/22/04 06/26/04 04/14/02 12/06/02 01/17/04 04/17/03 10/28/03 12/12/03 04/27/04 | |
| #50 ALEXANDER F FRIDKIS LOUISE FRIDKIS 96 STERLING ST BEACON, NY 12508 | 05/29/08 06/02/08 | $15,000.00 $10,000.00 $ 5,000.00 | 10/27/03 04/26/04 10/01/04 | | | |
| #51 AMANDA FIGU 64-48 BOOTH STREET APT 1-C REGO PARK QUEENS, NY 11374 | 05/30/08 06/02/08 | $ 1,687.28 | 03/03/99 | | | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #52<br>HELEN R RICHARDS<br>50 S. MERIDETH AVE, APT 4<br>PASADENA, CA  91106 | 05/30/08<br>06/02/08 | $ 1,000.00<br>$ 1,000.00 | 05/12/03<br>04/26/04 | |
| #53<br>HELENE C BROWN<br>524 KENDRICK ST, 2ND FLOOR<br>PHILADELPHIA, PA  19111 | 06/03/08<br>06/04/08 | $ 5,000.00 | 09/20/04 | |
| #54<br>LORETTA D PANUNTO<br>1013 WEYBRIDGE COURT<br>BENSALEM, PA  19020 | 06/03/08<br>06/04/08 | $ 3,586.72<br>$ 3,000.00 | 12/31/04<br>12/03/04 | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #55<br>JANET T BRADY<br>181 LONG HILL RD 75<br>LITTLE FALLS, NJ 07424 | 06/03/08<br>06/04/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |
| #56<br>RONALD G CALLANAN<br>3122 EAGLE BEND RD<br>SPRING HILL, FL 34606 | 06/03/08<br>06/06/08 | $ 2,632.11<br>$ 1,059.75<br>$ 1,000.00<br>$ 2,997.19<br>$ 1,498.19 | 01/10/03<br>12/07/04<br>05/07/04<br>02/28/06<br>08/28/06 | |
| #57<br>ROBERT EDWIN DEVINE<br>21621 SANDIA RD SP55<br>APPLE VALLEY, CA 92308 | 06/06/08<br>06/09/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #58 EVELYN F RODRIGUEZ 1154 LAKE RIDGE RD LAKE ALMANOR, CA 96137 | 05/09/08 06/09/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | |
| #59 HELEN M COX 33397 FARGO ST LIVONIA, MI 48152 | 06/06/08 06/09/08 | $ 2,973.38 $27,003.48 $ 7,000.00 $ 1,200.00 $14,640.46 $25,000.00 | 06/03/02 10/21/02 04/07/03 04/08/03 08/16/03 12/02/04 | |
| #60 ALAN D COX 1154 LAKE RIDGE LAKE ALMANOR, CA 96137 | 05/09/08 06/09/08 | $ 3,000.00 | | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #61<br>MILDRED L THOMAS<br>152 ALBEMARLE DR<br>BLUE BELL, PA 19422 | 05/10/08<br>06/09/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |
| #62<br>EILEEN BRENDEL<br>35-25 77 ST APT A66<br>JACKSON HTS, NY 11372 | 06/09/08<br>06/11/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |
| #63<br>NAOKO KOJIMA<br>108 E. 96TH STREET<br>APT #2B<br>NEW YORK, NY 10128 | 06/10/08<br>06/12/08 | $40,000.00<br>$50,000.00<br>$50,000.00<br>$40,000.00 | 03/14/03<br>10/03/02<br>07/29/02<br>03/21/03 | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #64<br>CHARLES P SMITH<br>PO BOX 15958<br>FORT WAYNE, IN  46885 | 06/09/08<br>06/12/08 | $12,000.00 | 04/30/03 | |
| #65<br>DALE E OHNEMUS TRUSTEE<br>SANDRA K OHNEMUS TRUSTEE<br>2900 STATE ST APT 101 B<br>QUENCY, IL  62301 | 06/09/08<br>06/16/08 | $ 1,000.00<br>$ 1,000.00 | 05/20/03<br>02/27/04 | |
| #66<br>KATHRYN A FIELDS<br>PO BOX 90696<br>PHOENIX, AZ  85066 | 06/10/08<br>06/16/08 | $ 1,087.07<br>$ 1,056.26<br>$ 5,724.71 | 12/29/02<br>06/05/02<br>02/10/03 | |

REQUESTS FOR EXCLUSION
RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #67 YEPRAM DERVAHANIAN 4756 FAIRLOOP RUN LEHIGH ACRES, FL  33973 | 06/14/08 06/17/08 | NO PRINCIPAL DETAIL GIVEN BY REQUESTOR | | |
| #68 KATHERINE A HOWE 175 UNION AVENUE - APT C301 RUTHERFORD, NJ  07070 | 05/28/08 06/17/08 | $10,000.00 $10,000.00 | 06/04/04 09/22/04 | |
| #69 CHRISTINE SNYDER 2676 PLEASANT VIEW ROAD NEW COLUMBIA, PA  17856 | 06/16/08 06/18/08 | $ 3,573.66 $28,798.98 $10,000.00 | 11/26/03 04/30/02 01/03/03 | |

IN RE ABFS NOTEHOLDERS LITIGATION

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #70<br>THOMAS SNYDER<br>2676 PLEASANT VIEW ROAD<br>NEW COLUMBIA, PA  17856 | 06/16/08<br>06/18/08 | 511,101.94 | 05/31/03 | |
| #71<br>DUANE E JENSEN<br>PHYLLIS G JENSEN<br>821 S HARRIET<br>ALGONA, IA  50511 | 06/16/08<br>06/19/08 | $10,000.00<br>$ 6,056.14<br>$13,420.33 | 02/20/04<br>08/31/04<br>01/05/03 | |
| #72<br>ROBERT CARR<br>SHIRLEY CARR<br>11760 ROSSMOOR LN<br>ST LOUIS, MO  63128 | 06/15/08<br>06/19/08 | $ 3,278.07 | 03/22/04 | |

REQUESTS FOR EXCLUSION

RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER<br>& NAME AND ADDRESS | POSTMARKED<br>& RECEIVED | PRINCIPAL<br>AMOUNT | PURCHASE<br>DATE | INFORMATION GIVEN<br>BY REQUESTOR |
|---|---|---|---|---|
| #10001<br>KARL DOLLINGER<br>MARY ANN DOLLINGER<br>3730 REINIGER ROAD<br>HATBORO, PA  19040 | 06/20/08<br>06/24/08 | $13,000.00<br>$ 2,176.93 | 02/16/04<br>02/10/05 | |
| #10002<br>JUNE HARRISON REED<br>818 N. DOHENY DRIVE<br>SUITE 1206<br>WEST HOLLYWOOD, CA  90069 | 06/27/08<br>07/01/08 | $10,000.00<br>$20,000.00<br>$10,000.00<br>$10,000.00 | 08/20/99<br>11/17/02<br>04/20/03<br>12/14/03 | |
| #10003<br>SALVATORE A RUSSO<br>ANGELA CAPANNA<br>40 WEST 72ND STREET<br>NEW YORK, NY  10023 | 07/08/08<br>07/11/08 | $ 3,413.74<br>$ 3,600.39<br>$ 3,277.08<br>$ 3,257.45 | 04/11/03<br>07/22/04<br>07/03/04<br>01/15/05 | |

IN RE ABFS NOTEHOLDERS LITIGATION

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #10004<br>ELVIRA Z SALVATORE<br>9601 LOMITA COURT<br>SPT 100<br>ALTA LOMA, CA 91701 | 07/15/08<br>07/20/08 | $25,088.37<br>$ 7,303.25<br>$ 5,085.79<br>$25,209.00 | | |
| #10005<br>PAUL MERRITT<br>201 CAROB LANE<br>ALAMEDA, CA 94502 | 07/17/08<br>07/21/08 | $10,000.00 | 07/11/00 | |
| #10006<br>LOUISE W MERRITT<br>201 CAROB LANE<br>ALAMEDA, CA 94502 | 07/17/08<br>07/21/08 | $10,000.00 | 07/16/03 | |

## REQUESTS FOR EXCLUSION
### RECEIVED THROUGH OCTOBER 27, 2008

| REFERENCE NUMBER & NAME AND ADDRESS | POSTMARKED & RECEIVED | PRINCIPAL AMOUNT | PURCHASE DATE | INFORMATION GIVEN BY REQUESTOR |
|---|---|---|---|---|
| #10007<br>MARY J JOHNSON<br>20020 EDDINGTON DR<br>CARSON, CA 90746 | 08/29/08<br>09/02/08 | NO PRINCIPAL DETAIL<br>GIVEN BY REQUESTOR | | |
| #20001<br>RENEE M MCCARTHY<br>4600 41ST AVE N<br>APT 206<br>ROBBINSDALE, MN 55422 | 10/16/08<br>10/20/08 | $15,000.00<br>$10,000.00<br>$ 5,000.00<br>$ 5,000.00<br>$ 6,000.00 | 10/08/03<br>10/22/03<br>01/14/04<br>04/16/04<br>03/01/04 | |

Total: 80                         Total Principal: 1,468,120